1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BRADLEY DAVID KNOX                    )   CAUSE NO. _____
                                      )
       Petitioner,                    )   PETITIONER'S MEMORANDUM IN
                                      )   SUPPORT OF WRIT
       v.                             )
                                      )
DANIEL W. WHITE,                      )
                                      )
       Respondent.                    )
                                      )
                                      )
                                      )
_____       )

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

       Petitioner Bradley David Knox petitions this Court to issue a writ of habeas under
28 U.S.C. § 2254 on the grounds that his convictions and custody in a prison in the State
of Washington violate the Constitution and laws of the United States.  Mr. Knox is
confined on the basis of two separate judgments from Washington State courts: Cowlitz
County Superior Court Nos. 14-1-00095-0 & 14-1-01283-4.  The cases were joined for
trial, direct appeal and collateral attack in state court, but Mr. Knox is filing two separate
petitions in this Court, one for each judgment.  The two petitions should be consolidated
into one case.

       One of the main issues in these petitions is the State's failure to disclose (and Mr.
Knox's lawyer's failure to uncover) significant impeachment evidence regarding the
State's main witness against Mr. Knox, a jail informant named Otis Pippen Jr. – namely,

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 1
*Knox v. White*, C21 - _____

evidence the Mr. Pippen had committed a series of sex crimes against children and one adult woman in Cowlitz County, but was given protection against prosecution not only by the chief detective in the cases against Mr. Knox (Det. B.J. Mortensen), but also by Mr. Pippen's own lawyer who became the chief criminal deputy of the Cowlitz County Prosecuting Attorney's Office. This conflicted role (the informant's lawyer becoming the prosecutor who protected his former client) denied Mr. Knox due process of law under the Fourteenth Amendment – both as a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and the denial of a prosecutor who was neutral. Additionally, the judge in Mr. Knox's case had also represented Mr. Pippen, while there was a complicated web of other conflicts of interest by Mr. Knox's various attorneys, all leading to violations of the Sixth and Fourteenth Amendments. There were several other federal constitutional violations as well that will be explained more in detail below.

These petitions are timely under 28 U.S.C. § 2244(d), and the claims have been fully exhausted in Washington State courts. Mr. Knox therefore asks that the Court vacate the state court judgments and sentences in the Superior Court of the State of Washington for Cowlitz County, No. 14-1-00095-0 & 14-1-01283-4, and order that he be released from confinement.

**1.** __Statement of Facts__

  **a.** *__Procedural History__*

Petitioner Bradley David Knox applies for relief from confinement, pursuant to 28 U.S.C. § 2254. Mr. Knox is now in the custody of the Washington State Department of Corrections at the Washington Corrections Center in Shelton, Washington. His Washington State Department of Corrections number is 266401. Respondent Daniel W. White is the Superintendent of the Washington Corrections Center.

In 2015, Mr. Knox was convicted in Cowlitz County Superior Court No. 14-1-00095-0 of drug and firearm charges for items found in a trailer on some industrial property in Longview, Washington, in January 2014, property that was shared with Christian Sullivan and frequented by Cassandra Crimmins and Robert Tubbs.

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 2
*Knox v. White*, C21 - _____

**Law Office of Neil Fox, PLLC**
**2125 Western Ave., Ste. 330**
**Seattle, Washington 98121**
**206-728-5440**

1    In Cowlitz County Superior Court No. 14-1-01283-4 (tried jointly with No.

2    14-1-00095-0), Mr. Knox was convicted of one count of solicitation to commit murder for

3    making statements in the jail in October 2014 to a jail informant, Otis Pippen Jr., about

4    Steven Walker, the boyfriend of Ms. Crimmins.  Mr. Knox was found "not guilty" of

5    soliciting Pippen to kill Ms. Crimmins and Haley Crookshanks.[1]

6    In December 2015, Judge Michael Evans sentenced Mr. Knox to serve 300 months

7    in prison for the solicitation case and 156 months for the drug case (to be served

8    concurrently). PRP Ex. 1 at 112-23; PRP Ex. 3 at 176-87.[2] Mr. Knox appealed and lost,

9    and the Washington Supreme Court denied review on December 6, 2017.  *State v. Knox*,

10   COA No. 48473-1-II, Sup. Ct. No. 94885-2; PRP Ex. 4 at 190-99.  Mr. Knox did not file

11   a petition for a writ of certiorari to the U.S. Supreme Court.

12   On December 5, 2018, Mr. Knox filed a timely Personal Restraint Petition ("PRP")

13   in the Washington Court of Appeals contesting both judgments. He raised a series of

14   claims related to Mr. Pippen's undisclosed history, conflicts of interest of the lawyers,

15   prosecutors and judge, the lack of a "true threat" instruction and other issues. On April 28,

16   2020, the Court of Appeals rejected Knox's claims and dismissed his petition.  Ex. 4 at

17   13-53.

18   Mr. Knox filed a timely motion for discretionary review to the Washington

19   Supreme Court. No. 98603-7.  On November 23, 2020, the Deputy Commissioner of the

20   Washington Supreme Court denied discretionary review. Ex. 3 at 7-12.  Mr. Knox filed

21   a timely motion to modify to the full court, but this motion was denied on February 3,

22

23

24   _____

25   [1]    Ms. Crookshanks was the complainant in an unlawful imprisonment case in which Mr.
     Knox was found "not guilty." Cowlitz County Superior Court No. 14-1-01040-8.

26
27   [2]    Mr. Knox filed 794 pages of exhibits along with his state post-conviction petition
     (excluding the sealed exhibits).  He is filing them with this writ as one unit, and they will be referred to

28   as "PRP Ex. ___ at ____" (with the page number).  He is filing separately the key decisions in the state
     post-conviction case, and these will be referred to simply as "Ex ___ at ___." The redactions on these
     exhibits come from (1) the original sources of some of the documents, (2) redactions made for filing in
     the state court, and (3) redactions made for filing in this Court.

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 3
*Knox v. White*, C21 - _____

Law Office of Neil Fox, PLLC
2125 Western Ave., Ste. 330
Seattle, Washington 98121
206-728-5440

1  2021. Ex. 2 at 5-6. The certificate of finality was issued on March 18, 2021. Ex. 1 at 3-4.

2  Mr. Knox now seeks relief in this Court under 28 U.S.C. § 2254.

3        **b.   _Substantive Facts_**

4        **i.   VUCSA Case (14-1-00095-0)**

5        On January 17, 2014, officers with the "Street Crimes Unit" of the  Longview

6  Police Department ("LPD"), led by Det. Benjamin Joseph ("B.J.") Mortensen, raided

7  commercial property on California Way in Longview, Washington.   The property

8  contained a motor home, owned by Mr. Knox, and a storage building, eight to fifteen feet

9  away, containing a loft area where Christian Sullivan resided.  In the motor home, the

10  police found two handguns, cellphones, plastic bags, a glass smoking pipe with residue,

11  a digital scale, and items of dominion and control with Knox's name on them.  They found

12  two baggies with a small amount of methamphetamine in the main area of the motor home

13  (one in the freezer door) and another baggy with another small amount in the bedroom.

14  RP (10/14/15) 399-409, 413-14, 426-28, 481-82, 486-88.[3]   The total amount of

15  methamphetamine actually tested (what was found in the freezer door) weighed 27.4

16  grams.  RP (10/14/15) 481-82; RP (10/15/15) 544.

17        Prior to the search, the police observed Mr. Knox leaving the property in a vehicle.

18  The police stopped the vehicle, driven by Curtis Stone, and arrested Knox, who had $2405

19  in currency on his person, but no drugs.  Knox allegedly admitted he lived at the motor

20  home, allegedly told an officer where and how much meth there would be inside, and

21  allegedly said he was a "lower-end dealer" and needed a firearm to protect against

22  robberies.  RP (10/14/15) 400-02, 424-25, 457, 462-63, 475-82.  However, according to

23  Det. Seth Libbey, Knox spoke in a "cryptic" fashion, essentially stating that the "last time

24  he had seen" the drugs they were in the freezer.  RP (10/14/15) 485.

25        Mr. Knox testified that he never admitted ownership of the methamphetamine and

26  guns, and actually said he used drugs, but did not sell them.  He testified that, although he

27

28
        _____

        [3]      Transcript citations will be to the original pages in the transcripts with the date of the
        hearing, as opposed to the pagination in the state court record that is not yet filed by the respondent.

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 4
_Knox v. White_, C21 - _____

**Law Office of Neil Fox, PLLC**
**2125 Western Ave., Ste. 330**
**Seattle, Washington 98121**
**206-728-5440**

owned the motor home and kept property there, he actually resided in a trailer park in Kelso with Curtis Stone.  RP (10/16/15) 752-61, 798-811. Mr. Knox's son verified his father lived with Stone, not at the motor home.  RP (10/16/15) 724-30.  Knox testified that Christian Sullivan lived in the storage building near the motor home, that a woman named Cassandra Crimmins would stay there too and told him that she had a gun, that Sullivan and others who visited would use the motor home's bathroom (since the storage building did not have its own bathroom) and that many other people hung out at the motor home and did drugs.  RP (10/14/15) 488-89; RP (10/16/15) 753-61, 798-811.  Notably, when arrested, while Mr. Knox had the key to the motor home, he did not have the key to enter the fenced area surrounding the property, and officers had to use bolt-cutters to gain access.  RP (10/14/15) 402, 425-26, 478.

While the police were conducting the search, they detained Christian Sullivan in a nearby vehicle.  He had methamphetamine on his person.   The police also found firearms (including one that was stolen) in a loft area of the storage building tied to Sullivan.  Knox had told them that Sullivan was a drug dealer.  RP (10/14/15) 410-12, 484.  As a result, Mr. Sullivan was charged and pled guilty to VUCSA and firearm charges in Cowlitz County No. 14-1-00097-6. The guilty plea was entered on April 21, 2014, and Sullivan was sentenced on August 26, 2014.  Mr. Sullivan's attorney was Thad Scudder at the Cowlitz County Office of Public Defense ("CCOPD"). PRP Ex. 24 at 512, 516-38.

On one occasion, another attorney in Scudder's office, Joshua Baldwin, appeared in court in Mr. Sullivan's case to ask for a continuance.  PRP Ex. 24 at 550; PRP Ex. 25 at 599.  Mr. Scudder did not file a notice of withdrawal after Sullivan was sentenced, and Mr. Scudder's name appears on a restitution order that was filed on October 27, 2014. PRP Ex. 24 at 539.  Sullivan went on to commit additional crimes in 2014 and 2015, and was variously represented by Mr. Scudder, and a private attorney, with a contract to handle public defense conflicts, Kevin Blondin. PRP Ex. 25 at 560-603; PRP Ex. 26 at 604-21.

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 5
*Knox v. White*, C21 - _____

Law Office of Neil Fox, PLLC
2125 Western Ave., Ste. 330
Seattle, Washington 98121
206-728-5440

1    At the same time that the police detained Mr. Sullivan, they also arrested Robert

2  Sidney Tubbs, who was in the car with Sullivan.  Tubbs was later charged and convicted

3  for VUCSA in Cowlitz County Sup. Court No. 14-1-00096-8 for possession of

4  methamphetamine as a result of what was found at the time of this arrest. PRP Ex. 27 at

5  635-36, 642-43, 647-48, 650-73.  Mr. Tubbs' was also assigned a lawyer at CCOPD. PRP

6  Ex. 27 at 639, 644.  Initially, his attorney was Ryan Jurvakainen but, in July 2014, Mr.

7  Jurvakainen withdrew from representing Mr. Tubbs. PRP Ex. 27 at 645-46.  Mr. Tubbs'

8  defense presumably would be in conflict with the others as Tubbs' address was listed on

9  the police report as "transient," PRP Ex. 27 at 678, and thus his association with Sullivan

10  and at the California Way address would make him another suspect for the drugs and guns

11  found at that location.

12    In November 2014, Mr. Jurvakainen won the election to become Cowlitz County

13  Prosecuting Attorney, and he assumed office in January 2015, taking public defender Tom

14  Ladouceur with him as his chief criminal deputy. PRP Ex. 34 763-66.  Both Jurvakainen

15  and Ladouceur filed forms in some (but not all) of Mr. Knox's cases stating that because

16  they or others in their former public defense firm had represented Knox, they would not

17  be involved in prosecuting his cases, noting that they would be screened from the cases

18  and that DPA Jason Laurine would be the final decisionmaker.[4]  Nonetheless, pleadings

19  continued to be filed in Mr. Knox's cases under the signature or on the letterhead of Mr.

20  Jurvakainen, including subpoenas, jury instructions and legal memoranda.  PRP Ex. 1 at

21  13, 14, 28-31, 40; PRP Ex. 3 at 152,164, 165-66, 167-70, 171-72.

22    Mr. Knox was initially represented in the VUCSA case by a public defender,

23  Joshua Baldwin.   However, because Mr. Sullivan was represented by Mr. Scudder, who

24  was in the same office, a few weeks after Baldwin was assigned the case, he withdrew due

25  ─────────────

26   [4]     PRP Ex. 1 at 18-19 & 24-25 (Ladouceur's 3/24/15 & 5/4/15 declarations filed in 14-1-
    00095-0); PRP Ex. 2 at 131-34 (Ladouceur's and Jurvakainen's 3/24/15 declarations filed in
27   14-1-01040-8); PRP Ex. 3 at 146-49 (Ladouceur's and Jurvakainen's declarations filed on 3/24/15 and
    5/7/15 in 14-1-01283-4).  Mr. Jurvakainen did not file a similar declaration in 14-1-00095-0, the case
28   where he briefly represented Mr. Tubbs before withdrawing due to a conflict of interest.  Notably, no such
    screening declarations from either Mr. Jurvakainen or Mr. Ladouceur appear in Otis Pippen's 2014
    VUCSA file.  PRP Ex. 15 at 303-45.

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 6
*Knox v. White*, C21 - _____

1   to a conflict of interest.   PRP Ex. 1 at 8-9, 124-25.  Mr. Baldwin wrote to Knox and

2   informed him of this conflict.  PRP Ex. 32 at 755, 759.  Conflict attorney Kevin Blondin

3   took over the case, on February 4, 2014.  PRP Ex. 1 at 125; PRP Ex. 33 at 761.

4        Mr. Blondin represented Mr. Knox until October 16, 2014, at which time he

5   withdrew and Mr. Baldwin took the case over again.  PRP Ex. 1 at 126. Mr. Baldwin told

6   the judge that he would have to do a conflict check.  PRP Ex. 38 at 782.  It is not clear if

7   that took place because Mr. Baldwin continued to represent Knox on the drug case until

8   he left the public defender's office and passed the case to Simmie Baer, who had recently

9   been hired at CCOPD.  PRP Ex. 32 at 756.  At least on one occasion, on March 3, 2015,

10  Thad Scudder (Christian Sullivan's attorney) appeared in court on behalf of Mr. Knox on

11  the VUCSA and solicitation cases (standing in for Mr. Baldwin).  PRP Ex. 1 at 127; PRP

12  Ex. 3 at 188.   Ms. Baer tried the case to a jury in October 2015.

13       At trial, Ms. Baer tried to introduce evidence that the drugs and guns found in the

14  motor home were actually owned by "another suspect" – her office's other client,

15  Christian Sullivan.   PRP Ex. 3 at 16-63.   She proffered Mr. Sullivan's guilty plea

16  statement and judgment as evidence, subpoenaing the court clerk to set the foundation for

17  these documents.  RP (10/13/15) 361-64; PRP Ex. 31 at 751-53.   Ms. Baer had

18  interviewed Mr. Sullivan at Stafford Creek Corrections Center in June 2015.  However,

19  she did not call Sullivan as a defense witness because he claimed to her that all the drugs

20  belonged to Mr. Knox.  PRP Ex. 30 at 750. At trial, Judge Evans allowed evidence

21  regarding the other drugs and guns found in the storage building, purportedly related to

22  Sullivan, he excluded Sullivan's guilty plea form and judgment. RP (10/13/15) 366-67.

23  The jury returned guilty verdicts to all counts connected with the VUCSA case.  PRP Ex.

24  1 at 79-84.

25       On the last day of the trial, a woman dropped off at Ms. Baer's office a folder

26  containing a declaration signed by Cassandra Crimmins.  In the declaration, dated May

27  5, 2014, Crimmins  took responsibility for ownership of the drugs and guns found in the

28

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 7
*Knox v. White*, C21 - _____

1  motor home.  RP (12/22/15) 1068; PRP Ex. 1 at 86-89; PRP Ex. 30 at 748.[5]  Ms. Baer had

2  known from prior counsel that Ms. Crimmins had at various times taken responsibility for

3  the drugs and guns in the motor home,[6] but despite many attempts to locate her, Ms. Baer

4  was unable to subpoena her to court for trial.  PRP Ex. 30 at 748; RP (12/22/15) 1068-70.

5  After the trial, Ms. Baer located Ms. Crimmins in jail. She spoke to Crimmins in person,

6  who verified the veracity of her written statement. PRP Ex. 30 at 748; RP 1067-68.[7]  Ms.

7  Baer filed a motion for a new trial, claiming newly discovered evidence.  PRP Ex. 1 at 86-

8  89.

9      Ms. Crimmins' statement admitting responsibility was important because the State

10  cross-examined Mr. Knox about his attorney's announcement that Ms. Crimmins would

11  testify at trial, the allegation that he actually paid Crimmins $8000 to testify for him and

12  that she and her boyfriend, Steven Walker, took the money and bought a truck, and the

13  fact that Crimmins and Walker "didn't show up to testify."  In response to this cross-

14

15      [5]   The packet apparently contained prior versions of the statement.  The one

16  submitted with Ms. Baer's new trial motion is at PRP Ex. 8 at 217.  The other versions are at PRP

17  Ex. 8 at 218-21.

18      [6]   At the time that Mr. Blondin represented Mr. Knox, he spoke with Ms. Crimmins

19  but did not take any statements from her.  PRP Ex. 33 at 761.

20      [7]   Det. B.J. Mortensen claimed he interviewed Crimmins in the jail in March 2015

21  (without giving a date).  Mortensen failed to document his interview with Crimmins properly,
and only wrote a report months later, in July 2015, when he claimed that Crimmins told him that

22  Knox had paid her $20,000 to write out a statement admitting responsibility.  PRP Ex. 9 at 222-
24.

23

24  In March 2015, Crimmins was facing her own serious charges – she was arrested on
March 10, 2015, and charged with arson.  She was initially held in jail on $20,000 bail.  At

25  arraignment, Kevin Blondin (Mr. Knox's lawyer on the drug case) was appointed to represent
Crimmins, and she pled guilty to malicious mischief in the first degree on March 24, 2015.  PRP

26  Ex. 12 at 24-67.  Thus, at the time that Mortensen claimed he spoke to Crimmins in the jail,
Crimmins' lawyer, Mr. Blondin, essentially had a conflict of interest as he had spoken to

27  Crimmins about taking responsibility for the drugs and guns when he was representing Mr. Knox.
PRP Ex. 33 at 761-62.  It is not clear how Mr. Blondin could have advised Crimmins about what

28  to say to Det. Mortensen given his prior involvement as Knox's attorney.

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 8
*Knox v. White*, C21 - \_\_\_\_\_

Law Office of Neil Fox, PLLC
2125 Western Ave., Ste. 330
Seattle, Washington 98121
206-728-5440

1   examination, Knox asked, "Was there something I could see to see where I said that?";
2   he denied paying Crimmins money and stated that when he met Walker, he already had
3   a truck, "so I don't know where you guys are coming up with this stuff." RP (10/16/15)
4   838-40.

5          Both Crimmins and Walker were available to the State during Knox's trial.
6   Crimmins was actually in the Cowlitz County Jail for a portion of Knox's trial, PRP Ex.
7   1 at 93, 97-99, 101, while Walker was in the custody of the Department of Corrections,
8   having been sentenced on September 29, 2015, to 51 months in prison. PRP Ex. 29 at 730-
9   742.  Neither the State nor the defense called Crimmins or Walker as witnesses at Knox's
10  trial.   The State also never introduced evidence to tie up its impeachment (1) that Mr.
11  Knox's attorney announced that Crimmins would be a witness, (2) that Knox actually paid
12  Crimmins $8000, (3) that Crimmins and Walker used the money to buy a truck, or (4) that
13  Crimmins did not show up to court at any particular hearing.

14         Judge Evans denied the motion for a new trial, ruling that although Ms. Crimmins'
15  testimony was "material," Knox's attorney, Ms. Baer, was not diligent in trying to locate
16  her, having not used a private investigator to try to find her and subpoena her prior to trial.
17  Judge Evans did state that Ms. Baer "did all within her power to find Ms. Crimmons [sic],
18  including attending hearings and following up on phone numbers that were given to her
19  from Mr. Knox and others and also house locations and going the extra effort there." RP
20  (12/22/15) 1083-85; PRP Ex. 1 at 108-11. While Ms. Baer did not use an investigator, she
21  did her own investigation and attempted to locate Ms. Crimmins (and other witnesses)
22  herself.  PRP Ex. 30 at 748.  Ms. Baer also did not discover (and the State did not inform
23  her) that Longview police officers had information, revealed when they were investigating
24  break-ins at the California Way address, that Ms. Crimmins actually did store her property
25  there. *See* PRP Ex. 10 at 229.

26                              **ii.       Solicitation Case (14-1-01283-4)**

27         When Mr. Knox was charged with false imprisonment, he was jailed pending trial.
28  After he was beat up by another inmate, he was housed in the Cowlitz County Jail's
    medical unit.   Otis Pippen Jr. was in the same unit.  RP (10/16/15) 780-81; PRP Ex. 37

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 9
*Knox v. White*, C21 - _____

Law Office of Neil Fox, PLLC
2125 Western Ave., Ste. 330
Seattle, Washington 98121
206-728-5440

at 776.  Mr. Pippen had an extensive criminal history, and was a failed police informant who had unsuccessfully tried to work off a series of drug and theft charges.  Det. B.J. Mortensen was his "handler," and Pippen was facing a return to prison because he failed to fulfill his "contract."  He continued to use drugs while he was supposed to be working for the police, and he was charged with a series of crimes (as well as having an uncharged felony theft over his head).  RP (10/15/15) 554-55, 564-70, 599-602; 618, 621-29; PRP Ex. 15 at 303-23.

Looking at a way to avoid prison, in September 2014, Pippen told his lawyer, public defender Tom Ladouceur,[8] that he had information that he could trade in exchange for dismissal of his own cases.  Pippen claimed that Mr. Knox had approached him in the jail and solicited him to kill Ms. Crookshanks (the alleged victim in the unlawful imprisonment case, No. 14-1-01040-8), Ms. Crimmins and her boyfriend, Steven Walker. RP (10/15/15) 602-08.  At trial, however, Mr. Knox testified that it was Pippen who initiated the contacts, and it was Pippen who continually approached him "out of the blue" and raised the subject of killing people.  RP (10/16/15) 783-89.

Because Mr. Ladouceur worked in the same office as Mr. Baldwin, who was still representing Knox on an unlawful imprisonment charge (involving Ms. Crookshanks) and another 2013 drug case,[9] Ladouceur withdrew as Pippen's lawyer. PRP Ex. 15 at 323; Ex. 39 at 786-90; PRP Ex. 41.[10]  There was no general screening mechanism set up in the public defender's office.  PRP Ex. 32 at 756. Thus, there were no procedures in force to have prevented Ladouceur and Baldwin whose offices were apparently next to each other, PRP Ex. 30 at 747, or other lawyers in that office, from sharing information about their cases with each other, before or after Ladouceur withdrew.

---

[8]    Mr. Ladouceur had a prior professional relationship with Pippen, as he handled Pippen's 2012 probation violation hearings. PRP Ex. 14 at 300-02.

[9]    Mr. Blondin was still representing Mr. Knox on the 2014 drug case at that point.

[10]    The motion and order to withdraw (PRP Ex. 41) was sealed, and thus will be filed separately along with a motion to seal.

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 10
*Knox v. White*, C21 - _____

1    Attorney Bruce Hanify was assigned to represent Pippen. PRP Ex. 15 at 323-26;

2    PRP Ex. 39 at 788. Mr. Hanify had recently been at the public defender's office and even

3    though his name continued to appear on the firm's letterhead in 2014 (at the same time

4    Knox was represented by that firm), PRP Ex. 32 at 759, Hanify had apparently left the

5    public defenders and was in private practice.  Pippen then entered into an oral agreement

6    with the State by which the drug and theft charges against him would be dismissed or not

7    filed, and he would wear a wire in the jail with the goal of getting Mr. Knox on a

8    recording asking him to kill people.   RP (10/15/15) 556-57, 620, 674. Mr. Pippen was

9    released from jail in his own case, RP (10/15/15) 561,[11] and, ultimately, after Mr. Knox's

10   trial, on February 1, 2016, the pending charges against Pippen were dismissed.  PRP Ex.

11   15 at 343-45.

12    Pippen wore a wire on October 6, 2014, but the police claimed that it was

13   "unusable."  RP (10/15/15) 577.  *See also* RP (10/15/15) 558-60.  As one detective

14   explained, "There's a lot of ambient noise within the pod and the verbals were not coming

15   through very well.  It's very difficult to understand anything. . . . I don't recall anything

16   that was significant, any kind of language that we could hear or anything specific."  RP

17   (10/15/15) 587-88.[12]   In one report, Sgt. Hartley stated that "During this interaction

18   between the CI and Knox there was a brief conversation about the subject matter of this

19   case however statements made by Knox were sketchy at best due to the high volume of

20   ambient noise in the jail's 'G' pod."  PRP Ex. 6 at 212.  The State did not turn the

21   "sketchy" recording over to the defense, and it is not clear what happened to the recording

22   as it was not introduced at trial.  PRP Ex. 30 at 745.

23    On October 8, 2018, Pippen wore a wire again, and the two had conversation about

24   Pippen killing three people -- Haley Crookshanks, Cassandra Crimmins and Steven

25   Walker – in exchange for payment of money or drugs.  Mr. Knox would constantly change

---

26

27       [11]    The record is unclear as to exactly how Mr. Pippen was released from custody as
there does not appear to have been a judicial order releasing him or the posting of bail.

28
        [12]    Pippen testified that he actually wore a wire three (not two) times. RP (10/15/15)
610-11.  It is unclear what happened to the third recording.

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 11
*Knox v. White*, C21 - _____

Law Office of Neil Fox, PLLC
2125 Western Ave., Ste. 330
Seattle, Washington 98121
206-728-5440

his mind, however, and would make contradictory statements like expressing his concern that he did not want people killed (such as his own witnesses) and did not want Pippen to do anything that would result in him getting in trouble.  RP (10/15/15) 578-83, 589-96, 612-17, 632-33, 665-77.[13]

While the State's theory that Knox would want to prevent Ms. Crookshanks (the complainant in the unlawful imprisonment case that resulted in a "not guilty" verdict) from coming to court made a modicum of sense, the State's theories regarding Crimmins and Walker did not make sense at all.  Purportedly, Mr. Knox had given money to Ms. Crimmins to admit that the drugs and guns found in the motor home on January 17, 2014, were hers.  In fact, as noted, Ms. Crimmins had taken responsibility for the drugs and guns, Knox's lawyers knew that she had done so, and Knox himself knew it.  PRP Ex. 8 at 217; PRP Ex. 32 at 756-57; PRP Ex. 33 at 761-62; PRP Ex. 37 at 778.  Thus, it is not clear why Mr. Knox would want Crimmins dead.

As for Mr. Walker, he was another addict who apparently was Ms. Crimmins' boyfriend.  He too had an extensive criminal history and was represented on various occasions by lawyers in the public defender's office, including Mr. Scudder in 2006 and Richard Suryan for part of 2015. PRP Ex. 28 at 679-701; PRP Ex. 29 at 703-10.  It is not completely clear why Mr. Knox would want Mr. Walker dead as he had nothing to do with any of his cases.[14]  As noted, the State cross-examined Mr. Knox about the theory that he supposedly paid Ms. Crimmins $8000 to accept responsibility for the guns, and that she and Mr. Walker did not show up at some unknown hearing to testify but instead bought a truck.  RP (10/16/15) 839-40.  Again, when Knox denied this allegation, the State did not call either Walker or Crimmins as rebuttal witnesses.

---

[13]    The recording was never transcribed.  A copy of the digital audio file will be filed with the Court, however.

[14]    Pippen and Knox had very confused conversations about killing Walker, but not Crimmins, with Knox stating at times that  "didn't want her killed now but to kidnap her and to murder her boyfriend as a way to motivate her to testify and also kidnap her child as well." RP (10/15/15) 595. Yet, Crimmins never expressed an unwillingness to testify, so the statements really are nonsensical.

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 12
*Knox v. White*, C21 - _____

At times on the second recording, Mr. Knox did say things about killing people, but he testified he did not want anyone to die; he was under a lot of mental health strains in the jail, and was just giving in to Pippen's constant badgering – he wanted the witnesses to come in and tell the truth. RP (10/16/15) 751, 784-97, 842-52.  Mr. Knox testified that Pippen had followed him around the jail for weeks, haranguing him.  RP (10/16/15) 849 ("I couldn't get away from him. It's a small 40 x 40 cells, he followed me around" and that he would yell at Pippen to go away – "I screamed it loud across the day room many times.").

Mr. Knox offered a diminished capacity defense.  A forensic psychiatrist, Dr. Jerry Larsen, testified that Mr. Knox suffered from bi-polar disorder and major depression. Knox had not been medicated when he was in the jail with Pippen, a very high stress environment.  Knox exhibited "tangential" and disorganized thinking, and was highly suggestible, agreeing with others.  His speech on the jail recording evidenced nonsensical, non-logical thinking.  RP (10/16/15) 864-883.

Because most of Pippen's and Knox's interactions were not recorded or were recorded on the undisclosed "sketchy" recording, much of the case revolved around the credibility of either Pippen or Knox as to who initiated conversations and under what circumstances Knox may have been led to say anything about hiring Pippen to kill people. While Mr. Pippen did not claim to have an unblemished character, he purported to have offered to help the police because:

> I might be a lot of things, but I'm not a murderer. I don't kill nobody. I had to take my dog to the vet to be put down, I couldn't do that. How could I kill somebody else.

RP (10/15/16) 608. Pippen also claimed that if he did not do something, "if I allowed that to continue without doing something about it I'm no better than he is." RP (10/15/15) 632.

### iii.    The State Withheld Mr. Pippen's Background

Because Mr. Pippen was a key witness in the solicitation case, Mr. Knox's lawyer, Ms. Baer, wanted to know about his background so that she could impeach him at trial. PRP Ex. 30 at 745.  In her omnibus request, she specifically asked for all material related

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 13
*Knox v. White*, C21 - _____

Law Office of Neil Fox, PLLC
2125 Western Ave., Ste. 330
Seattle, Washington 98121
206-728-5440

1   to Mr. Pippen and his criminal history.  PRP Ex. 3 at 151.   In court, Ms. Baer repeated

2   her requests:

3           And again that would be *Brady* material that would go to the
        credibility of that witness, and that really is the State's main witness on this
4       case from his contacts with my client in the jail.  So in order to be able to
        fully cross-examine and effectively represent Mr. Knox it would be his
5       constitutional due-process right to have any and all of that information
        about the person they intend to put on to prove their case of solicitation of
6       murder.

7   RP (7/7/15) 52.  The court granted this request, although giving the State the opportunity

8   to come back and limit the extent of disclosure if need be.  RP (7/7/15) 52; PRP Ex. 3 at

9   151.

10          In response to Ms. Baer's requests, on September 16, 2015, the prosecutor (Sean

11  Brittain) sent Ms. Baer an email listing only Pippen's convictions.  PRP Ex. 17 at 354.

12  Mr. Brittain also provided Ms. Baer with Pippen's informant "packet," which included the

13  original contract with Pippen when he was initially trying to work off his theft case.  PRP

14  Ex. 16 at 346-53. The packet also included various police reports related to the theft case

15  and the now filed drug cases.  Mr. Brittain told Ms. Baer something like "this is it," and

16  never tried to limit the scope of Ms. Baer's pretrial requests.  PRP Ex. 30 at 746.

17          Det. B.J. Mortensen also set out Mr. Pippen's criminal history when he described

18  his background as the informant in his police report. PRP Ex. 5 at 203.  Neither Det.

19  Mortensen nor Mr. Brittain relayed any information about Pippen's arrests or other

20  charges that did not lead to convictions (except for the theft case).  Ms. Baer relied on the

21  State's disclosure of Pippen's past record when at trial she attacked Pippen's credibility

22  directly.  PRP Ex. 30 at 746.

23          Mr. Knox had known generally about various rumors that Pippen was the subject

24  of prior sex crime investigations and told Mr. Baldwin and Ms. Baer about those

25  investigations.  PRP Ex. 38 at 777.  However, what Mr. Knox did not know and what the

26  State did not tell either Ms. Baer or Mr. Baldwin is that Longview police *recently*

27  investigated Pippen for two sex offenses – the rape of an adult woman in January 2014,

28  and the molestation of a young girl in January 2015 (which took place after the intercept

but before trial).  In neither case, did Ms. Baer find out about these incidents herself, nor

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 14
*Knox v. White*, C21 - _____

1   did the State reveal the allegations to the defense. PRP Ex. 30 at 746-47; PRP Ex. 32 at

2   757-58; PRP Ex. 38 at 777.  Mr. Knox's current counsel only learned of these allegations

3   through PRA requests in the Summer and Fall of 2018.  PRP Ex. 40 at 793.

4        In Longview Police Department No.  L14-105 and No. L14-107, Det. B.J.

5   Mortensen  –  Mr. Pippen's handler for his own drug cases in 2014, and one of the main

6   detectives in both the drug and solicitation cases against Mr. Knox –  detailed how on

7   January 5, 2014, he investigated a domestic violence case at a group home in Longview.

8   He arrested M.S. for malicious mischief after she allegedly kicked a hole in Mr. Pippen's

9   door.  She had been arguing with Pippen either over his laptop or drugs, and had accused

10  him of being a rapist and a "Chimo."[15]   M.S. told Det. Mortensen that Mr. Pippen

11  raped her while she was sleeping.  Pippen denied he raped M.S., stating that he did not

12  need to do that because he had many other girlfriends.  PRP Ex. 18 at 355-76. It is not

13  clear what Det. Mortensen then did with this investigation and whether it ever came up

14  in the following months when Pippen was working for him as an informant.  The victim,

15  M.S., was charged and convicted of malicious mischief in Cowlitz County District Court

16  No. CR0140619.  PRP Ex. 19 at 377-81.  Mr. Pippen was never charged with raping or

17  even assaulting M.S.

18       Having not been arrested and charged with rape against M.S., and having been

19  given special treatment and released from jail after informing on Mr. Knox, Pippen was

20  soon after accused of molesting a seven-year old girl, "J.E." who lived in his trailer park

21  in Longview ( L15-401, PRP Ex. 20 at 382-418).  In January 2015, J.E. reported the

22  molestation to her mother, Cindy E., not long after Mr. Pippen had touched J.E.'s pubic

23  area over clothing when he was over at the trailer watching a movie and the mother was

24  asleep.  The police reports note that there had been other sexual misconduct allegations

25  against Pippen including allegations that he molested his grandchildren, although he was

26

27

28

---

[15]     Child molester?

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 15
*Knox v. White*, C21 - _____

Law Office of Neil Fox, PLLC
2125 Western Ave., Ste. 330
Seattle, Washington 98121
206-728-5440

never actually charged with these incidents.[16]  The detective's report lists the following

case numbers, which are related to these earlier sexual allegations against Mr. Pippen.

L94-22714, L96-12852, L02-24837.  PRP Ex. 20 at 416.  *See also* PRP Ex. 21 at 419-457;

PRP Ex. 22 at 458-500.

Although Mr. Pippen denied J.E.'s allegations, in his January 27, 2015, interview

at the police station, he admitted that he used to sell drugs to Cindy E.  He claimed that

he stopped using and selling drugs about a month earlier, though.[17]  This admission to the

police would mean that Pippen was still using and selling drugs after he was released from

the Cowlitz County Jail in October 2014 – after cooperating in the case against Mr. Knox

while his own superior case was being continued and continued pending his testimony

against Mr. Knox.  PRP Ex. 15 at 328-45.

Although the police conducted a forensic interview on January 22, 2015 with J.E.

at the Child Justice Advocacy Center ("CJAC"), again no sex charges were filed against

---

[16]     Longview Police Detective Lozano stated:

I told Otis that I am aware of the past allegations against him and shared my concerns. Otis blamed his ex- wife for the allegations involving his grandchildren and said that she was mad at him because he would not have sex with her. Otis denied that he did anything inappropriate to his children or grandchildren.

PRP Ex. 20 at 391-92.

[17]     The police report stated:

In brief, Otis acknowledged that he has known Cindy for several years because he used to sell her drugs. He said that he hadn't seen her for several years until recently. According to Otis, Cindy asked him to get her some drugs but he said that he stopped selling and using illegal drugs. I confronted him that according to Spillman police records, he was recently arrested for possession. *Otis said that for the past month or so he has stopped using and selling drugs.* He never confirmed or denied whether he provided Cindy with illegal drugs.

PRP Ex. 20 at 391 (emphasis added)

At Knox's trial, on re-direct, Pippen admitted he struggled with addiction and continued to do drugs while he was working off his drug contract.  He mumbled something about not being able to see his grandchildren.  RP (10/15/15) 631.  He did not testify that he continued to sell drugs even after he was released from jail in October 2014, nor did he state that he could not see his grandchildren because of the allegations of sexual abuse against him (rather than because of his drug problem).

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 16
*Knox v. White*, C21 - _____

Pippen.  The police had given Pippen a so-called "voice stress" test which he "passed." PRP Ex. 20 at 408-09.  In light of Pippen passing this unusual test, Det. Lozano did not think there was probable cause:

> At this time, I am unable to establish P. C. that Pippen touched [J.E.'s] pubic area with his hand for sexual gratification. I cannot find a motive for [J.E.] to fabricate the story and by all accounts she does not make false reports. There is reason to be concerned with Pippen and the unrelated past allegations; however, at this time charges cannot be supported.

PRP Ex. 20 at 392.

The Cowlitz County Prosecuting Attorney's Office had actual knowledge about these new allegations against Pippen.  When the CJAC interview was being set up on January 22, 2015, Detective Lozano emailed Ryan Jurvakainen (who recently became the elected Cowlitz County Prosecuting Attorney), and Tom Ladouceur (the new chief criminal deputy and Mr. Pippen's former lawyer), asking them to attend the interview. Lozano stated in this email that the suspect (Mr. Pippen) had reportedly "admitted to the crime." PRP Ex. 20 at 414.  The CJAC form that was attached to the email specifically named Mr. Pippen as the suspect.  PRP Ex. 20 at 412, 415.

Mr. Ladouceur – again, Mr. Pippen's lawyer just a few months earlier who knew that Pippen was informing on Mr. Knox – attended the CJAC interview and observed it through glass.  Det. Lozano's report explicitly states:

> On 1/ 22/ 2015, at approximately 12: 37 hrs, Detective J. D. Johnson, forensic interviewer, met with [redacted] in the child interview room. [Redacted] prefers to be referred to as "[redacted]." ***CCDP Tom Ladouceur and I observed the interview via the one-way mirror***. CJAC Director, Christi Brittain observed portions of the interview, which was audio and video recorded.

PRP Ex. 20 at 388 (emphasis added).

The allegations against Pippen for raping M.S., molesting J.E. and other children, and selling and using drugs as late as December 2014 was not the only information withheld from the defense.  After he was released from jail in October 2014, Pippen continuously missed court, but routinely either no warrants issued or when warrants were issued, they were quashed.  PRP Ex. 15 at 329-41.  Thus, Mr. Pippen was allowed to be loose in the community, despite actual police and prosecutorial knowledge that he

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 17
*Knox v. White*, C21 - _____

1   continued to buy and sell drugs and continued his history of sexual assaulting vulnerable

2   people.  Nothing happened to Pippen for this behavior, and this favorable treatment was

3   not disclosed to the defense.  PRP Ex. 30 at 747.

4        When Mr. Knox was sentenced after trial, his attorney, Ms. Baer, sought an

5   exceptionally low sentence, noting Mr. Knox's mental health history.  RP (12/22/15)

6   1106-10.   Judge Evans denied the request, stating "Mr. Pippen, you know, certainly he

7   has his motives and he has his desires to achieve certain things, and certainly he played

8   a part in this. There was nobody forcing Mr. Knox to say or do the things he did."  RP

9   (12/22/15) 1122.

10        Before he became a judge in 2008, Judge Evans had been a criminal defense

11   attorney.  In that capacity, in 2006, Judge Evans had  represented Mr. Pippen in Cowlitz

12   County Sup. Ct. No. 06-1-00071-1.  This case involved domestic violence where Pippen

13   attacked multiple members of his family and destroyed property with, inter alia, a butcher

14   knife, a flashlight, a table leg and a motor vehicle.  PRP Ex. 13 at 268-299.  Judge Evans'

15   prior representation of Mr. Pippen was not disclosed to counsel for Mr. Knox nor did Ms.

16   Baer and Mr. Knox know of such representation.  Had they known, they would have

17   moved to recuse Judge Evans or would have filed an affidavit of prejudice against him.

18   PRP Ex. 30 at 747-48; PRP Ex. 37 at 777.

19        **2.**     **Jurisdiction, Venue, Timeliness, and Exhaustion**

20        This Court has personal jurisdiction and venue is proper under 28 U.S.C. § 2241(d)

21   because Mr. Knox was convicted in Cowlitz County Superior Court, Washington, located

22   within the Western District of Washington.  Mr. Knox is confined by the Washington

23   State Department of Corrections in the Washington Corrections Center in Shelton,

24   Washington.  The Respondent, Daniel W. White, is the Superintendent of that prison

25   complex.  The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 2241, and

26   2254.

27        Petitioner has no future sentence to serve if the convictions and sentences are set

28   aside.  Mr. Knox has not filed any prior petitions under 28 U.S.C. § 2254.

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 18
*Knox v. White*, C21 - _____

Law Office of Neil Fox, PLLC
2125 Western Ave., Ste. 330
Seattle, Washington 98121
206-728-5440

These petitions are timely under 28 U.S.C. § 2244(d).  The Washington Supreme Court denied review of Mr. Knox's direct appeal on December 6, 2017. The 90-day limit to file a petition for writ of *certiorari* under Sup. Ct. Rule 13 expired on March 6, 2018, the conclusion of direct review of Knox's convictions.  Therefore, the one year time limit for filing a petition under 28 U.S.C. § 2254, began running on March 7, 2018.  *See Gonzalez v. Thaler*,  565 U.S. 134, 150 (2012).

Mr. Knox filed his Personal Restraint Petition in state court on December 5, 2018, 273 days after March 7, 2018, with 92 days remaining.  Mr. Wilson's state post-conviction petition was pending in Washington State courts until March 18, 2021, when the certificate of finality issued. *See Phongmanivan v. Haynes*, 195 Wn.2d 309, 2020 Wash. LEXIS 124, 2020 WL 946132 (2020); *Phongmanivan v. Haynes*, 800 Fed. Appx. 567 (9th Ci. 2020).  The federal time limit began running again on March 19, 2021, and expires on June 19, 2021.  These petitions are filed before that date and are timely under 28 U.S.C. § 2244(d).

All issues raised in this petition were raised in state court and are fully exhausted.

**3.** **Argument**

a. *Standard of Review*

Article III, Section 1, of the Constitution vests federal "judicial power" wholly within the judicial branch of government.  In *Marbury v. Madison*, 5 U.S. 137, 177, 1 Cranch 137 (1803), the Supreme Court held: "It is emphatically the province and duty of the judicial department to say what the law is." Construing "the law" and insuring it is consistent with the Constitution is, in the words of Chief Justice John Marshall, the "very essence of judicial duty." *Id*. at 178.  A federal court therefore cannot be bound by a state court's mistaken understanding of federal constitutional law.  Such deference would violate the Supremacy Clause of Article VI, paragraph 2.

Consideration of a federal court's constitutional duties is tempered by the strictures of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Under this statute, a federal court may grant relief, "only if the last reasoned state decision was 'based on an unreasonable determination of the facts in light of the evidence presented in [the]

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 19
*Knox v. White*, C21 - _____

State court proceeding' or on a legal determination that was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Ocampo v. Vail*, 649 F.3d 1098, 1106 (9th Cir. 2011) (some internal quotations omitted) (quoting 28 U.S.C. § 2254(d)(1)).

A state court's decision is "contrary to" clearly established Supreme Court precedent if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court's decision is an unreasonable application of clearly established Supreme Court precedent "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*.

Additionally, relief can be also be granted if the state court "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). A federal court should not defer to a state court's decision that is based on a misapprehension of the facts. *See Milke v. Ryan*, 711 F.3d 998, 1010 (9th Cir. 2013). Finally, where state courts have failed to address federal law in reviewing a claim or applied the wrong standard, any deference that might otherwise be afforded to the state court opinions does not apply and review in federal court is *de novo*. *See Crace v. Herzog*, 798 F.3d 840, 852 (9th Cir. 2015); *Barker v. Fleming*, 423 F.3d 1085, 1095 (9th Cir. 2005).

In this process, this Court must "identify the state court decision that is appropriate for our review." *Barker v. Fleming*, 423 F.3d at 1091. Although "AEDPA generally requires federal courts to review one state decision," where "the last reasoned decision adopted or substantially incorporated the reasoning from a previous decision . . . it [is] reasonable for the reviewing court to look at both decisions to fully ascertain the reasoning of the last decision." *Id*. at 1093; *see also Amado v. Gonzalez*, 758 F.3d 1119, 1130 (9th Cir. 2014) ("When the last reasoned decision is a state appellate court decision which 'adopt[s]' or 'substantially incorporate[s]' lower state court decisions, we may review

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 20
*Knox v. White*, C21 - _____

1  those lower state court decisions as part of our review of the state appellate court's

2  decision." ) (quoting *Barker*, 423 F.3d at 1093).

3       In the instant case, although the Deputy Commissioner of the Washington Supreme

4  Court issued a written ruling denying review, he essentially incorporated the Court of

5  Appeals' decision.  *See* Ex. 2 at 9-11 ("The Court of Appeals addresses these issues in

6  a thorough and detailed 40-page opinion . . . . Again, the Court of Appeals addressed these

7  matters in detail. . . . again, the Court of Appeals applied correct legal principles to Mr.

8  Knox's constitutional claim. . . . But again, the Court of Appeals thoroughly analyzed

9  these claims under correct legal principles").  Accordingly, although the "last reasoned

10  decision" is the Deputy Commissioner's ruling, review under AEDPA needs to be also of

11  the Court of Appeals' decision.

12       **b.**   ***Ground 1 – The Court of Appeals and the Supreme Court***
            ***Commissioner Failed to Use the Proper Federal Standard***
13            ***to Assess the <u>Brady</u> Violations***

14       The chief criminal deputy of the Cowlitz County Prosecuting Attorney's Office

15  protected his former client, Otis Pippen, not only by not charging him with molesting yet

16  another young girl after a string of sexual assault allegations stretching over two decades,

17  but then by not disclosing his shocking history to Mr. Knox's lawyer whose strategy was

18  to discredit and impeach Pippen's credibility.  Although the State portrayed Mr. Pippen

19  as a sad but kind witness – an addict who could not see his own grandchildren when he

20  was using drugs, RP (10/15/15) 631, who purported to inform on Knox because he could

21  not even "put down" a dog, RP (10/15/15) 608 -- in reality, Pippen, an informant for the

22  police, was a serial child molester and rapist who was seemingly immune to prosecution

23  for his many crimes.

24       Under *Brady v. Maryland*, *supra*, and the Due Process Clause of the Fourteenth

25  Amendment to the United States Constitution, the State had the obligation to disclose

26  material impeachment information about its witnesses, information that the defendant

27  would normally use in cross-examination, as guaranteed by the Confrontation Clause of

28  the Sixth Amendment (as incorporated by the Fourteenth Amendment's Due Process

    Clause). *See Kyles v. Whitley*, 514 U.S. 419, 432-37 (1995). This is particularly the case

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 21
*Knox v. White*, C21 - \_\_\_\_\_

1  for key prosecution witnesses and informants.[18]  "Suppression occurs whenever the

2  government fails to disclose evidence, regardless of the government's good or bad faith."

3  *United States v. Obagi*, 965 F.3d 993, 997 (9th Cir. 2020) (citing *Wearry v. Cain*, 577 U.S.

4  ___, 136 S. Ct. 1002, 1006, 194 L. Ed. 2d 798 (2016)).

5       Evidence is material for *Brady* purposes when there is "any reasonable likelihood

6  it could have affected the judgment of the jury." *Wearry v. Cain*, 136 S. Ct. at 1006

7  (internal quotations and citations omitted). To prevail on a *Brady* claim, a defendant "need

8  not show that he 'more likely than not' would have been acquitted had the new evidence

9  been admitted . . . . He must show only that the new evidence is sufficient to 'undermine

10 confidence' in the verdict." *Wearry v. Cain*, 136 S. Ct. 1006.  In practice, the issue is

11 whether there is a "reasonable probability" that "a single juror" would have had a reason

12 to doubt the State's evidence had all evidence come out at trial.[19]  In *Wearry*, the Supreme

13 Court held that the "undermine confidence" standard was such that "Wearry can prevail

14 even if . . . the undisclosed information may not have affected the jury's verdict." *Wearry*

15 *v. Cain*, 136 S. Ct at 1006 n.6.

16       The Washington Court of Appeals in Mr. Knox's case failed to apply (or even

17 discuss) the "one juror" standard. It also did not properly apply the "undermine

18 confidence" standard, ignoring the above-quoted language in *Wearry* about how a

19 petitioner can prevail even if the undisclosed information may not have affected the jury

20 verdict. Indeed, the Court of Appeals twice incorrectly stated that it was "unlikely" the

[18]  *See United States v. Kohring*, 637 F.3d 895, 904-06 & n.4 (9th Cir. 2011); *Benn v. Lambert*, 283 F. 3d 1040, 1054-58 (9th Cir. 2002).

[19]  *See Buck v. Davis*, ___ U.S. ___, 137 S. Ct. 759, 776, 197 L. Ed. 2d 1 (2017) ("the question before the District Court was whether Buck had demonstrated a reasonable probability that, without Dr. Quijano's testimony on race, at least one juror would have harbored a reasonable doubt about whether Buck was likely to be violent in the future."); *Cone v. Bell*, 556 U.S. 449, 452, 129, S. Ct. 1769, 174 L. Ed. 2d 701 (2009) (remanding the case to the "District Court to determine in the first instance whether there is a reasonable probability that the withheld evidence would have altered at least one juror's assessment of the appropriate penalty for Cone's crimes"); *United States v. Kohring*, 637 F.3d 895, 906 (9th Cir. 2011) ("there is a reasonable probability that the withheld evidence would have altered at least one juror's assessment regarding Allen's testimony against Kohring") (internal quotes omitted).

suppressed information would have affected the result at trial, Ex. 4 at 31, when, as noted above, the federal standard is clearly not "more likely than not."

The Deputy Commissioner denied review, ruling that the Court of Appeals' analysis was correct:

> But the notion that one juror may have prevented unanimity is necessarily subsumed within the analysis of whether there is a reasonable probability the result would have been different. There is nothing in the Court of Appeals analysis that suggests it did not have this notion in mind. The court applied the correct law.

Ex. 2 at 9-10.

This conclusion is wrong given the Court of Appeals' explicit use of the incorrect "unlikely" standard and its failure even to mention the U.S. Supreme Court's holding in *Wearry* that the "undermine confidence" standard was such that "Wearry can prevail even if . . . the undisclosed information may not have affected the jury's verdict." *Wearry v. Cain*, 136 S. Ct at 1006 n.6. Using the wrong legal standard to review a *Brady* claim is objectively unreasonable under AEDPA and quintessentially a reason not to apply AEDPA-deference. *See Tarango v. McDaniel*, 815 F.3d 1211, 1220 (9th Cir. 2016) ("Where a state court fails to apply the clearly established federal law, applying an incorrect standard in reaching its decision, 'the state court's adjudication [is] contrary to clearly established law.'") (citing *Lafler v. Cooper*, 566 U.S. 156, 173 (2012)); *Crace v. Herzog*, *supra* (lack of deference because of Washington Supreme Court's application of wrong test under *Strickland*). *See also Mann v. Ryan*, 828 F.3d 1143, 1166 (9th Cir. 2016) (Thomas J., concurring and dissenting) ("Although the majority may be correct that the difference between the 'more-likely-than-not' and 'reasonable probability' standards is outcome determinative 'in the rarest case,' it is a difference that permits us to make that assessment de novo, rather than through AEDPA's deferential lens.").

Moreover, the Court of Appeals incorrectly stressed other impeachment information about Pippen that was disclosed, Ex. 4 at 30-32, whereas, under federal constitutional principles, withheld impeachment evidence is not immaterial just because a witness was impeached with other evidence on *other* matters:

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 23
*Knox v. White*, C21 - _____

1

2
          As the dissent recognizes, "Scott did not have an exemplary record
   of veracity." *Post*, at ___, 194 L. Ed. 2d, at 88. Scott's credibility,

3  already impugned by his many inconsistent stories, would have been further
   diminished had the jury learned that Hutchinson may have been physically

4  incapable of performing the role Scott ascribed to him, that Scott had
   coached another inmate to lie about the murder and thereby enhance his

5  chances to get out of jail, or that Scott may have implicated Wearry to settle
   a personal score. [Footnote omitted] Moreover, any juror who found Scott

6  more credible in light of Brown's testimony might have thought differently
   had she learned that Brown may have been motivated to come forward not

7  by his sister's relationship with the victim's sister—as the prosecution had
   insisted in its closing argument—but by the possibility of a reduced

8  sentence on an existing conviction. *See Napue* [*v. Illinois,* 360 U.S. 264,]
   270, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 [(1959)] (even though the State had
   made no binding promises, a witness' attempt to obtain a deal before

9  testifying was material because the jury "might well have concluded that
   [the witness] had fabricated testimony in order to curry the [prosecution's]
   favor").

10
*Wearry*, 136 S. Ct. at 1006-07.

11

12        In this case, the withheld evidence was qualitatively different than the evidence that

13 was disclosed (about how Pippen had failed to fulfill the contract with Det. Mortensen and

14 hoped to get out of jail for drug cases).  In contrast to the State's portrayal of Pippen as

15 an "honorable criminal" with a substance abuse problem, Pippen was facing an

16 indeterminate life sentence for recent and older child[20] molestation charges and a lengthy

17 sentence for the recent rape of an adult woman,[21] and had admitted dealing drugs while

18 released from jail pending his testimony against Knox, all of which were being ignored

19

20        [20]      The Washington Court of Appeals concluded that the 1994, 1996 and 2002 child

21 molestation charges would likely be inadmissible. Ex. 4 at 31. But these crimes were still within the statute
   of limitations in 2014 and 2015, RCW 9A.04.080, and thus were admissible to show Pippen's bias under

22 the Sixth Amendment's Confrontation Clause. The Court of Appeals also concluded that the older
   incidents would not be admissible as they would be impeachment on a collateral matter. Ex. 4 at 31.

23 However, the State opened the door by claiming Pippen could not see his grandchildren because he
   struggled with addiction, RP (10/15/15) 631, whereas he likely could not see them because he had

24 molested them. PRP Ex. 20 at 391-92; PRP Ex. 21 at 437-44. Evidence of the older allegations would
   have been admissible under Washington law to complete the State's misleading tapestry. *See State v.*

25 *Renneberg*, 83 Wn.2d 735, 738, 522 P.2d 835 (1974); *State v. Brush*, 32 Wn. App. 445, 452-53, 648 P.2d
   897 (1983).

26

27        [21]      In the adult rape case from January 2014, Pippen was given protection by his handler, Det.

28 Mortensen, who continued to employ Mr. Pippen as a drug informant for months afterwards, a fact that
   would have been admissible as evidence of bad police work and bias. *See Kyles*, 514 U.S. at 442 n.13 &
   446 (discussing how withheld information could have been used to attack the reliability of a "shoddy"
   police investigation).

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 24
*Knox v. White*, C21 - _____

by the police and his lawyer, the chief criminal deputy prosecutor.[22] In this regard, the Court of Appeals failed to address the impact of the impeachment not just on Pippen but on Det. Mortensen's credibility and bias and even the prosecutor's office that brought the charges against Knox while giving favored status to Pippen's crime spree of sex offenses over a twenty year period.

Even the Court of Appeals' discussion of the quality of the State's evidence was deficient. By suggesting that the jury only convicted Mr. Knox for the one count involving Mr. Walker (who was not even a witness in any of Mr. Knox's cases) because that was the only count verified by the recording, Ex. 4 at 31,[23] the Court of Appeals ignored Mr. Knox's actual defense. Knox did not deny the nonsensical ramblings on the recording, but instead advanced a diminished capacity defense and argued he did not intend to harm anyone.[24] The whole issue in the case was not what took place *on* the recording, but rather what took place *off* the one disclosed recording when Pippen and Knox each claimed the other initiated the conversations about killing people.  Pippen's credibility and bias were thus central to the case and the entire tenor of the case would have been different if the jurors knew that Pippen was a serial sex offender who the police and his former lawyer, the chief criminal deputy of the prosecutor's office, gave *carte blanche* to commit serious crimes because of his usefulness as an informant. The withheld evidence clearly undermines confidence in the verdict under *Wearry*.

Because the Washington courts applied the wrong standard for assessing the prejudice of the clear *Brady* violation – the failure to disclose how the State protected its informant by not charging him with a series of sex offenses, and allowed him to molest

---

[22]     *See, e.g.*, *Benn v. Lambert*, 283 F.3d 1040, 1058 (9th Cir. 2002) ("The undisclosed benefits that Patrick received added significantly to the benefits that were disclosed and certainly would have 'cast a shadow' on Patrick's credibility. Thus, their suppression was material.").

[23]     On the one recording turned over to the defense, Mr. Knox actually did make threats not just about Walker, but also about Cassandra Crimmins and Ms. Crookshanks (the complainant in the imprisonment case), wanting Crookshanks to "disappear," although when the subject of Crimmins came up, Knox realized he needed her to testify (which demonstrated Mr. Knox's confused mental state) (2:06:40--2:17:00).

[24]     *See* RP (10/16/15) 751, 784-97, 842-52, 864-883.

Law Office of Neil Fox, PLLC
2125 Western Ave., Ste. 330
Seattle, Washington 98121
206-728-5440

1
2
3

children and one adult woman in Cowlitz County, presumably as payment for his service as an informant against Mr. Knox and others – review by this Court should be *de novo*. *Crace v. Herzog*, 798 F.3d at 852.

4
5
6
7
8
9
10
11
12
13
14

The information about Mr. Pippen was clearly impeachment evidence, in the possession of the Cowlitz County Prosecuting Attorney's Office and its cooperating law enforcement agencies. This is not even a case where the prosecutors or the main law enforcement officers were negligent in searching for impeachment evidence about Mr. Pippen. They had actual knowledge of Pippen's recent attacks on M.S. and the girl in the trailer park — Det. Mortensen was the investigator of Pippen's rape of M.S. , while the chief criminal deputy of the prosecutor's office who was involved in the investigation into Pippen was Pippen's own lawyer when Pippen decided to cut a deal and testify against Mr. Knox. The only issue of is whether the withheld information was material in the sense that its suppression caused prejudice. *See United States v. Bundy*, 968 F.3d 1019, 1031 (9th Cir. 2020).

15
16
17
18
19
20
21
22

As noted above, under *Wearry*, the prejudice is apparent – the withheld evidence here is sufficient to "undermine confidence" in the verdict" as there is a "reasonable probability" that "a single juror" would have had a reason to doubt the State's evidence had all evidence come out at trial. Given Pippen's key role in the case, and the lack of any corroborating evidence of his claims that Mr. Knox approached him off the recording, and given Mr. Knox's clear confused mental state, if the State had disclosed Mr. Pippen's sordid history, there is a reasonable likelihood the outcome of the case would have been different, particularly given the acquittals that occurred on the other counts. T

23
24
25
26
27
28

he extensive evidence about the protection given to Mr. Pippen undermines confidence in the outcome, and, accordingly, this Court should grant relief. Mr. Knox's right to due process of law under the Fourteenth Amendment was violated. The withholding of impeachment evidence directly impacted his ability to cross-examine Mr. Pippen and thus the *Brady* violation caused a violation of Mr. Knox's right to confront witnesses, protected by the Sixth and Fourteenth Amendments.

1

2

3

    **c.**    ***Grounds 2, 3 and 4 – The Pervasive Conflicts of Interest Between Defense Counsel for Mr. Knox, Defense Counsel for the Witnesses and Co-Defendants, the Judge and the Prosecutor Should Lead to Relief***

4

5

6

7

8

9

10

11

Before he was elected as the prosecuting attorney of Cowlitz County, Ryan Jurvakainen worked for the Cowlitz County Office of Public Defense and briefly represented a co-defendant of Mr. Knox's in the VUCSA case, Robert Tubbs.  PRP Ex. 27 at 645.  There were no regular screening devices in force at this public defender office to set up "walls" when there might be conflicts of interest. PRP Ex. 32 at 756.  When Mr. Jurvakainen became the elected prosecutor of Cowlitz County, he did not screen himself from that same VUCSA case, while pleadings in the cases against Mr. Knox continued to be filed over Mr. Jurvakainen's name.[25]

12

13

14

15

16

17

18

19

Another lawyer in Mr. Knox's attorney's office, Thomas Ladouceur, represented Mr. Pippen, and as noted, did not screen himself from Mr. Pippen's cases when he became chief criminal deputy of the Cowlitz County Prosecutor's office. When he became aware of his recent client's involvement in a new child sex case, Mr. Ladouceur not only gave Pippen a substantial benefit (not filing a child sex charge against him), but his office did not disclose the new charges to Mr. Knox's defense lawyers (who worked for Mr. Ladouceur's old public defender office).  Pippen's other prior lawyer was the trial judge, the Hon. Michael Evans.  PRP Ex. 13 at 268-299.

20

21

22

23

24

25

26

27

The main other suspect in the VUCSA case, Christian Sullivan, was represented by the Cowlitz County public defenders on the very same case – with lawyers from that office appearing in court for both Mr. Sullivan and Mr. Knox. PRP Ex. 1 at 127; PRP Ex. 3 at 188; PRP Ex. 24 at 550; PRP Ex. 25 at 599.  Another suspect in the VUCSA case – Cassandra Crimmins – who was not called as a witness and was the supposed "victim" of one of the solicitation counts was represented on her own cases by one of Mr. Knox's lawyers (Kevin Blondin, who also represented and appeared in court for Mr. Pippen), PRP Ex. 12 at 240-67; PRP Ex. 15 at 337-39, while others involved in Mr.

28

      [25]    *See*, *supra*, fn. 4.

**Law Office of Neil Fox, PLLC**
**2125 Western Ave., Ste. 330**
**Seattle, Washington 98121**
**206-728-5440**

Knox's cases, as witnesses or purported victims, were represented at various times by the same small group of lawyers, many who worked for the same firm as Mr. Knox's lawyers or were "conflict" counsel.[26]

This web of conflicts violated Mr. Knox's federal constitutional rights under the Sixth and Fourteenth Amendments.

Mr. Knox had a due process right under the Fourteenth Amendment to prosecutors free from conflict and who, like Mr. Jurvakainen and Mr. Ladouceur, did not owe loyalties to former clients whose interests were opposed to his (such as Mr. Pippen or Robert Tubbs). *See Ganger v. Peyton*, 379 F.2d 709, 714 (4th Cir. 1967) (due process violated when a part-time prosecutor represented defendant's wife in divorce case); *see also Cantrell v. Commonwealth*, 229 Va. 387, 393-94, 329 S.E.2d 22 (1985) (holding that "[a] conflict of interest on the part of the prosecution" violates the Due Process Clause of the Virginia Constitution).

In *Young v. U. S. ex rel. Vuitton et Fils S. A*., 481 U.S. 787 (1987) (plurality), the Supreme Court held that it was improper to appoint a private attorney to prosecute a criminal contempt for violations of an injunction against trademark infringement where the attorney also represented the trademark holder. *Id*. at 803-06. "A private attorney appointed to prosecute a criminal contempt therefore certainly should be as disinterested as a public prosecutor who undertakes such a prosecution." *Id*. at 806. To be sure, the lead opinion rested on the supervisory power of the courts, not due process which was the basis of Justice Blackmun's concurrence. *See Young*, 481 U.S. at 814-15 (Blackmun, J., concurring) ("I join Justice Brennan's opinion. I would go further, however, and hold that the practice -- federal or state -- of appointing an interested party's counsel to prosecute for criminal contempt is a violation of due process. This constitutional concept, in my

---

[26]     Ex. 5 at 54-57 is a description of these conflicts taken from the original PRP filed in state court.

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 28
*Knox v. White*, C21 - _____

view, requires a disinterested prosecutor with the unique responsibility to serve the public, rather than a private client, and to seek justice that is unfettered.").[27]

While there is no case directly on point with the unusual facts of this case, the reason is that such egregiousness is luckily uncommon and that no one would think that an informant's lawyer ought to be the one determining whether to charge him with a sex offense and ought to decide whether to disclose the allegations to the target of the informant.  Yet, the principle of due process guaranteeing a fair trial is clearly established federal law as determined by the U.S. Supreme Court.  *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982) ("Due process guarantees that a criminal defendant will be treated with that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.") (internal quotes omitted).  The outrageousness of the dual roles of the prosecutors in this case violate that basic guarantee of due process that is core to a fair trial.

Similarly, Mr. Knox had a constitutional right to "conflict-free" representation, with a lawyer who (and whose office) also did not represent those who he was blaming for the drugs and guns found at the industrial property in January 2014 (such as Christian Sullivan, Robert Tubbs, and Cassandra Crimmins), and lawyers, who either themselves or others in their office, did not also represent witnesses at various times in the solicitation case (such as Mr. Pippen, Ms. Crimmins, and others). This present and past concurrent representation violated the Sixth and Fourteenth Amendments.  *See Mickens v. Taylor*, 535 U.S. 162, 166-76 (2002). Finally, having a judge who was also Mr. Pippen's former lawyer violated the appearance of fairness doctrine and constituted a due process violation

---

[27]     *See also Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249-50 (1980) (dicta that the Court was not suggesting "the Due Process Clause imposes no limits on the partisanship of" prosecutors, for they "are also public officials" who "must serve the public interest," and that a "scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions.").

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 29
*Knox v. White*, C21 - _____

1
2
under the Fourteenth Amendment. *See Rippo v. Baker*, ___ U.S. ___, 137 S. Ct. 905, 907, 197 L. Ed. 2d 167 (2017).

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
The Washington Supreme Court Deputy Commissioner rejected these arguments, upholding the Court of Appeals' conclusions that there was no prejudice, that there were supposedly adequate screening mechanisms in place, and that there was no actual bias or potential for bias. Ex. 3 at 10-11. At the outset, this conclusion constitutes an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The state court record shows a complete lack of any regular screening mechanisms within the Cowlitz County public defender's office and, in fact, Mr. Knox's and Christian Sullivan's lawyers appeared for each other's clients at various hearings. PRP Ex. 1 at 127; PRP Ex. 3 at 188; PRP Ex. 24 at 550; PRP Ex. 25 at 599; PRP Ex. 32 at 756. This lack of screening meant that Mr. Ladouceur and Mr. Jurvakainen were deeply conflicted when they assumed the job of running the Cowlitz County Prosecuting Attorney's Office. While Mr. Jurvakainen screened himself from two of the three cases against Mr. Knox, the one case he did not screen himself from was the case where he represented another suspect, Mr. Tubbs, in the VUCSA case. Moreover, even though Mr. Jurvakainen claimed to screen himself from two of three of Knox's cases, the State continued to file pleadings in all cases under Jurvakainen's name. PRP Ex. 1 at 13, 14, 28-31, 40; PRP Ex. 3 at 152,164, 165-66, 167-70, 171-72. The other web of conflicts is similarly dizzying (i.e., Mr. Blondin representing Ms. Crimmins).

21
22
23
24
25
26
27
28
More importantly, while Mr. Ladouceur claimed to have screened himself from Mr. Knox's cases, he failed to screen himself from *Mr. Pippen's* case and then, knowing that Pippen was cutting a deal that had him inform on Knox, protected him by not charging him with child molestation, not disclosing to Knox's attorneys Pippen's criminal activities and not taking any action to have Pippen's PR revoked when he admitted buying and selling drugs when he was being investigated for child molestation. To conclude, as the Deputy Commissioner did, that "Mr. Knox failed to identify any actual prejudice as to this matter," Ex. 3 at 10, is just wrong – Mr. Knox was prejudiced when Pippen's attorney (who worked for the same agency as Knox's attorney) became the chief criminal deputy

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 30
*Knox v. White*, C21 - _____

Law Office of Neil Fox, PLLC
2125 Western Ave., Ste. 330
Seattle, Washington 98121
206-728-5440

prosecutor and then protected Pippen and failed to disclose to Knox's attorney the truth about Pippen – that he was not just a kindly drug addict shocked by Knox's attempts to hire him to kill someone, but was a sexual predator given huge benefits in exchange for his work.

Judge Evans' past representation of Mr. Pippen needs to be seen in this context – a context in which Mr. Pippen walked into the courtroom to testify against Mr. Knox, while protected by his lawyer (then the chief criminal deputy of the Cowlitz County Prosecuting Attorney's Office) and by his handler, Det. B.J. Mortensen (the main detective in the cases against Mr. Knox), and the very judge overseeing the trial was his former lawyer who had continuing ethical obligations of confidentiality and loyalty toward his former client. While there was not significant litigation at Knox's trial about the admissibility of Pippen's history (most of which was suppressed by the prosecutors), Judge Evans did opine when sentencing Mr. Knox that he did not think that Mr. Pippen "forced" Mr. Knox to say the things he did.[28] This dual role of Judge Evans (Pippen's former lawyer and the judge overseeing a trial where Pippen was the chief witness, making comments about Pippen's and Knox's interactions) would cause any reasonable observer to question his fairness and his potential for bias. *See Williams v. Pennsylvania*, ___ U. S. ___, 136 S. Ct. 1899, 1905, 195 L. Ed. 2d 132 (2016) ("The Court asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias.") (internal quotation marks omitted);

Either analyzed individually or collectively, the conflicts in this case were serious and pervasive, and violated Mr. Knox's right to counsel and to due process of law under the Sixth and Fourteenth Amendments – an informant given protection by his lawyer, the chief criminal deputy of the prosecutor's office; a judge who had once represented the

---

[28]    RP (12/22/15) 1122 ("Mr. Pippen, you know, certainly he has his motives and he has his desires to achieve certain things, and certainly he played a part in this. There was nobody forcing Mr. Knox to say or do the things he did.").

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 31
*Knox v. White*, C21 - _____

informant; witnesses, alleged victims, and "other suspects" represented by the same small circle of lawyers, sometimes at the same time on the same case by the same lawyers.

The Washington courts' treatment of these issues was seriously deficient and constituted an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," and Washington courts adopted a legal determination that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

The Court should review this issue *de novo* and conclude that Mr. Knox's rights to counsel and to due process of law, protected by the Sixth and Fourteenth Amendments, were violated.  This Court should grant relief to Mr. Knox.

   **d.    *Ground 5 – The Failure of the Solicitation Jury Instructions to Require a "True Threat" Violated Mr. Knox's First and Fourteenth Amendment Rights***

Mr. Knox's defense at trial to the solicitation charges was not that he did not say what he was accused of saying to Mr. Pippen, but rather that he suffered from diminished capacity and that his nonsensical statements to Pippen were the product of a mentally ill person in the stressful environment of a jail – that no reasonable person would construe his ramblings as a serious.  Yet, the jury was never instructed on the requirement of a "true threat"[29] – that a reasonable person would construe Knox's statements as a serious expression of intent to inflict bodily harm upon or take the life of another person.  The failure to give a "true threat" instruction where the allegations against Mr. Knox involved pure speech – criminal liability imposed on the words uttered to Mr. Pippen – violated the First and Fourteenth Amendments.[30]

---

[29]    The pertinent instructions are found at PRP Ex. 1 at 69, 75 (Instructions Nos. 26 and 32).

[30]    The Court does not have to determine whether RCW 9A.28.030, the solicitation statute, is unconstitutional on its face as the statute as applied to Mr. Knox in this case, absent a "true threat" instruction, violated the First and Fourteenth Amendments.

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 32
*Knox v. White*, C21 - _____

**Law Office of Neil Fox, PLLC**
**2125 Western Ave., Ste. 330**
**Seattle, Washington 98121**
**206-728-5440**

1
2
3
4
5
6
7
8
9
10
11
12
13

The Deputy Commissioner rejected this argument, ruling that the Court of Appeals correctly held that Washington's criminal solicitation statute's *mens rea* element (intent)[31] was sufficient to address free speech issues. Ex. 3 at 12.   The Deputy Commissioner expressly ruled that Mr. Knox could be convicted of solicitation to commit murder without an objectively reasonable "true threat" of harm: "The jury was satisfied that the State proved such intent as to one of the solicitation charges (it acquitted Mr. Knox of two other charges). It did not have to further find that the threat was 'true.'". Ex 3 at 12.   In other words, Mr. Knox could be convicted and sentenced to prison for decades based only upon words alone – pure speech -- without a finding that a reasonable person would take his words, the nonsensical statements of a mentally ill person in a jail, as a serious expression to harm another person.[32] This conclusion conflicts with clearly established law, as construed by the U.S. Supreme Court, which has traditionally adopted an objective, rather than a subjective, standard for determining a "true threat."

14
15
16
17
18

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."   "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989)..

19
20
21

The First Amendment's protections, though, are not absolute and there is no doubt that the government can regulate certain categories of expression consistent with the Constitution. *See, e.g., Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-572 (1942)

22
23

[31]     RCW 9A.28.030 provides:

24
25
26

   (1) A person is guilty of criminal solicitation when, with intent to promote or facilitate the commission of a crime, he or she offers to give or gives money or other thing of value to another to engage in specific conduct which would constitute such crime or which would establish complicity of such other person in its commission or attempted commission had such crime been attempted or committed.

27
28

[32]     The absurdity of Mr. Knox's statements to Mr. Pippen is illustrated by his statements about trying to hire Pippen to kill Cassandra Crimmins.   Yet, Ms. Crimmins was *his* witness, not the State's, and she had given a statement accepting responsibility for the drugs and guns that formed the basis of the charges against Knox in Cowlitz County Superior Court No. 14-1-00095-0.

Law Office of Neil Fox, PLLC
2125 Western Ave., Ste. 330
Seattle, Washington 98121
206-728-5440

("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem"). Thus, States may punish "fighting words" – those words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky*, 315 U.S. at 572. Fighting words are "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Cohen v. California*, 403 U.S. 15, 20 (1971).

The requirement of imminency here is important. The Supreme Court has made clear that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam).

Similarly, the Supreme Court has held that the First Amendment permits a State to ban a "true threat." *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam). A "true threat" can be banned because of the effect on other people. *R. A. V. v. St. Paul*, 505 U.S. 377, 388 (1992) (threats of violence are outside the First Amendment because of the need of "protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur").

Traditionally, what constitutes a true threat is whether an objective observer hearing or reading it in context would construe it "'as a serious expression of an intent to kill or injure' another person." *United States v. Weiss*, 475 F. Supp. 3d 1015, 1036 (N.D. Cal. 2020) (quoting *United States v. Bagdasarian*, 652 F.3d 1113, 1118 (9th Cir. 2011)). The emphasis is not solely on the speaker's intent, but on the reaction by others. *See Watts*, 394 U.S. at 708 ("But whatever the 'willfullness' requirement implies, the statute initially requires the Government to prove a true 'threat.' We do not believe that the kind of political hyperbole indulged in by petitioner fits within that statutory term.").

In other words, whatever the speaker intended is not dispositive – the issue regarding punishment of speech traditionally has been whether an objective reasonable

observer would see the speech as posing a threat of imminent physical harm to others.  *See Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 290 F.3d 1058, 1075 (9th Cir. 2002) (en banc) ("A true threat, that is one where a reasonable person would foresee that the listener will believe he will be subjected to physical violence upon his person, is unprotected by the first amendment.") (internal quotes and citations omitted); *United States v. Orozco-Santillan*, 903 F.2d 1262, 1265 (9th Cir. 1990) ("Whether a particular statement may properly be considered to be a threat is governed by an objective standard -- whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault."); *see also United States v. Havens*, 793 Fed. Appx. 475, 476 (9th Cir. 2019) ("To constitute a true threat, a statement must meet 'an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault,' and 'the speaker must subjectively intend to threaten.'") (quoting *United States v. Keyser*, 704 F.3d 631, 638 (9th Cir. 2012)).

When construing federal statutes, the Ninth Circuit has followed the plurality in *Virginia v. Black*, 538 U. S. 343 (2003), and held that the First Amendment's true threat requirement was subjective, not objective, with the issue being whether "'the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.' . . . It is therefore not sufficient that objective observers would reasonably perceive such speech as a threat of injury or death." *Bagdasarian*, 652 F.3d at 1116 (emphasis added) (quoting *Black*, 538 U.S. at 359 (plurality)).

However, for federal habeas purposes, the Ninth Circuit's construction of federal criminal law is not dispositive.  Rather, the issue is whether the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*."  28 U.S.C. § 2254(d)(1) (emphasis added).  "'This is a retrenchment from former practice, which allowed the United States courts of appeals to rely on their own jurisprudence in addition to that of the

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 35
*Knox v. White*, C21 - _____

Law Office of Neil Fox, PLLC
2125 Western Ave., Ste. 330
Seattle, Washington 98121
206-728-5440

1   Supreme Court. The novelty in this portion § 2254(d)(1) is not the 'contrary to' part but
2   the reference to 'Federal law, *as determined by the Supreme Court of the United States*."
3   (emphasis added).'" *Williams*, 529 U.S. at 381 (quoting *Lindh v. Murphy*, 96 F.3d 856,
4   869 (7th Cir. 1996), *rev'd on other grounds* 521 U.S. 320 (1997))

5       Nothing in *Virginia v. Black*, *supra*, altered the prior objective component of a
6   "true threat." *Black* was a case considering a Virginia statute that criminalized cross
7   burning "'with the intent of intimidating any person.'" *Black*, 538 U.S. at 348 (plurality)
8   (quoting Va. Code. Ann. § 18.2-423 (1996)).  The statute went further, however, by
9   creating a presumption that any cross burning "shall be prima facie evidence of an intent
10  to intimidate a person or group of persons." *Id*. at 348 (quoting Va. Code Ann. 18.2–423).
11  It was this *presumption* that rendered the statute unconstitutional for "[t]he First
12  Amendment does not permit such a shortcut." *Id*. at 367. In fact, the plurality made this
13  explicit in the first paragraph of the lead opinion: "We conclude that . . . the provision .
14  . . treating any cross burning as a prima facie evidence of intent to intimidate renders the
15  statute unconstitutional in its current form." *Id*. at 347–348.

16      In its discussion of the constitutionality of the presumption, the *Black* plurality did
17  state that a "true threat" was one "where the speaker means to communicate a serious
18  expression of an intent to commit an act of unlawful violence to a particular individual or
19  group of individuals." *Id*. at 359. However, the reference to a subjective standard was
20  dicta in that the focus of the case was really on the statutory presumption that "any cross
21  burning [w]as prima facie evidence of intent to intimidate," with the majority concluding
22  "this presumption failed to distinguish unprotected threats from protected speech because
23  it might allow convictions 'based solely on the fact of cross burning itself,' including cross
24  burnings in a play or at a political rally." *Elonis v. United States*, 575 U.S. 723, 135 S. Ct.
25  2001, 2027, 192 L. Ed. 2d 1 (2015) (Thomas, J., dissenting).

26      *Black* did not purport to alter the prior requirement of an objectively reasonable
27  person construing the threat as a being serious, as later federal cases confirmed.  *See, e.g.,*
28  *United States v. Dierks*, 978 F.3d 585, 592 (8th Cir. 2020) ("We conclude that the district

court should have required both a subjective finding of knowledge or intent and also an objective finding that the communication was threatening.").   As the Sixth Circuit noted:

> The reasonable-person standard winnows out protected speech because, instead of ignoring context, it forces jurors to examine the circumstances in which a statement is made . . . A reasonable listener understands that a gangster growling "I'd like to sew your mouth shut" to a recalcitrant debtor carries a different connotation from the impression left when a candidate uses those same words during a political debate. And a reasonable listener knows that the words "I'll tear your head off" mean something different when uttered by a professional football player from when uttered by a serial killer.
>
>           The objective standard also complements the explanation for excluding threats of violence from First Amendment protection in the first place. Much like their cousins libel, obscenity, and fighting words, true threats "by their very utterance inflict injury" on the recipient. *Chaplinsky*, 315 U.S. at 572. . . . What is excluded from First Amendment protection—threats rooted in their effect on the listener—works well with a test that focuses not on the intent of the speaker but on the effect on a reasonable listener of the speech.

*United States v. Jeffries*, 692 F.3d 473, 480 (6ᵗʰ Cir. 2012) (cited with approval in *Elonis*, 135 S. Ct. at 2027 (Thomas, J., dissenting)).

In any case, *Black* was a plurality decision and thus is of limited precedential value. *See Texas v. Brown*, 460 U.S. 730, 737 (1983) (stating that plurality view that does not command majority is not binding precedent).   When the Supreme Court was later presented with the chance to clarify its divided opinion in *Black* in *Elonis v. United States*, 575 U.S. 723, 135 S. Ct. 2001, 192 L. Ed. 2d 1 (2015), it avoided the First Amendment issues and decided the case on statutory grounds. *Elonis*, 135 S. Ct. at 2013.

Accordingly, as Justice Thomas has repeatedly made clear, a key issue for threat statutes is still not the intent of the speaker, but the reaction by others – an objective standard for deciding whether the threat was properly criminalized.  *See Elonis*, 135 S. Ct. at 2024-28 (Thomas, J., dissenting); *see also Kansas v. Boettger*, ___ U.S. ___, 140 S. Ct. 1956, 1958-59, 207 L. Ed. 2d 1089 (2020) (Thomas, J. dissenting from denial of *certiorari*) (noting split in authority on issue as to whether *Black* meant to jettison previous consensus that threatening speech may be punished under the First Amendment when a reasonable person would interpret the speech as a serious threat).  As the Supreme Court of Connecticut recently held, "We are persuaded by the reasoning of the courts that

have concluded that *Black* did not adopt a subjective intent standard. Indeed, nothing in *Black* itself suggests that the court intended to overrule the preexisting consensus among the federal circuit courts of appeals that threatening speech may be punished under the first amendment when a reasonable person would interpret the speech as a serious threat." *State v. Taupier*, 330 Conn. 149, 193 A.3d 1, 18 (2018).

Indeed, Washington State is amongst the jurisdictions that have continued to hold that the U.S. Supreme Court's "true threat" requirement is one that is based on an objective standard of reasonableness, not a subjective standard concentrating on the intent of the speaker. *See State v. Trey M.*, 186 Wn.2d 884, 383 P.3d 474, 478 (2016), *cert. denied sub nom.Trey M. v. Washington*, 138 S. Ct. 313, 99 L. Ed. 2d 207 (2017) ("This court has consistently relied on the objective (reasonable person) test since its adoption.").

In this case, the objective observer standard would have been key to a jury deciding that whatever crazy words Mr. Knox may have said in the jail to Mr. Pippen, and whatever his fleeting intent may have been, there was no actual murder for hire plot being created. Mr. Knox was not a Mafia Don, plotting to kill rivals to his criminal organization, nor was he a disgruntled spouse seeking to kill someone in the context of a divorce. Mr. Knox was a sad and powerless person, who had a public defender and lacked the funds to post bail in his own cases, let alone hire the likes of Otis Pippen to kill his friends for reasons that still are not clear. There was no money exchanged; no plan adopted; and, importantly, no actual motive to kill Mr. Walker. The only evidence against Mr. Knox involved pure speech, the ramblings of a mentally ill person at the jail that did not make any sense at all. Any objective observer would not see those ramblings as the equivalent of "fighting words" that justifies State intervention and imprisonment for decades, whatever Mr. Knox intended at the time he uttered the words. To avoid a violation of the First and Fourteenth Amendments, the jury in his case should have been given an instruction that to convict Mr. Knox, the State needed to prove that there was a "true threat" – that Mr. Knox's words would be taken by an objective observer and a serious expression of an intent to do harm to another person. The failure of the jury instructions in this case to include a "true threat" requirement made the conviction for solicitation in this case unconstitutional.

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 38
*Knox v. White*, C21 - _____

Law Office of Neil Fox, PLLC
2125 Western Ave., Ste. 330
Seattle, Washington 98121
206-728-5440

1
2
3
4
5
6
7
8
9

The Deputy Commissioner's ruling in this case conflicts with clearly established federal law as construed by the U.S. Supreme Court as expressed in *Watts* – a federal requirement that before someone can be convicted of a crime based upon spoken words only there must be a "true threat" that that a reasonable objective observer would construe the words a serious expression to harm another person.    Because the Deputy Commissioner used the wrong test, this Court should review the issue *de novo*.   *Crace v. Herzog*, *supra*. Given the prejudice to Mr. Knox – a conviction based solely on his words without regard to whether the words constituted a true threat – the Court should grant relief due to the violation of the First and Fourteenth Amendments.

10
11

   **e.** ***Grounds Six, Seven and Eight – Cumulative Error, Ineffective Counsel and The Failure to "Tie Up" Impeachment Evidence***

12
13
14
15
16
17

In his state court petition, Mr. Knox raised a claim that cumulative error violated his right to a fair jury trial and due process of law, protected by the Sixth and Fourteenth Amendments.  *See United States v. Preston*, 873 F.3d 829, 835 (9th Cir. 2017).  This claim was based on the combined effect of the *Brady* violations, defense counsels' conflicts of interest, a conflicted prosecutor's office, the judge's past representation of Pippen, and the lack of a "true threat" instruction.

18
19
20
21
22
23
24
25
26

There were other errors as well, such as the failure of the prosecutor to "tie up" the impeachment of Mr. Knox by stating in cross-examination, without introducing any evidence, that in fact Knox paid Ms. Crimmins $8,000, that his attorney announced that Crimmins would be called as a witness, and that Crimmins failed to appear to testify. The cross-examination without the prosecutor bringing in evidence to support his assertions violated Mr. Knox's to confront witnesses and due process under the Sixth and Fourteenth Amendments, a conclusion which the Court of Appeals agreed with under a series of Washington cases.[33]  However, the Court of Appeals did not find prejudice because the questions were "minor." Ex. 4 at 43.

27
28

---

[33] *See State v. Yoakum*, 37 Wn.2d 137, 144, 222 P.2d 181 (1950); *State v. Miles*, 139 Wn. App. 879, 886, 162 P.3d 1169 (2007); *State v. Babich*, 68 Wn. App. 438, 443-46, 842 P.2d 1053 (1993).

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 39
*Knox v. White*, C21 - _____

**Law Office of Neil Fox, PLLC**
**2125 Western Ave., Ste. 330**
**Seattle, Washington 98121**
**206-728-5440**

1  Similarly, Mr. Knox raised a claim of ineffective assistance counsel at trial and on
2  direct appeal under the Sixth and Fourteenth Amendments, *Strickland v. Washington*, 466
3  U.S. 668 (1984), and *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).  Mr. Knox argued that his
4  trial counsel (Simmie Baer) was not only conflicted, but also failed to uncover Pippen's
5  background, did not move to disqualify the prosecutor's office, did not find out the judge
6  had been Pippen's lawyer and failed to try to disqualify him, failed to subpoena Ms.
7  Crimmins or investigate her connection to the trailer, failed to object to the State's failure
8  to tie up its impeachment, and failed to request a "true threat" instruction. On appeal,
9  Knox's lawyer did not raise issues related to the "true threat" instruction, the failure of the
10  State to tie up the impeachment (with a direct appeal standard of harmlessness) or the
11  denial of the new trial motion.

12  While each of these issues alone should be a basis for granting relief in this Court,
13  when combined with the other issues (*Brady*, conflicts of interest, non-neutral prosecutors
14  and judge, no "true threat" instruction), the cumulative effect of all of these errors violated
15  the Sixth and Fourteenth Amendments.

16  The Supreme Court Commissioner never addressed the cumulative error argument
17  at all, Ex. 3 at 7-12, while the Court of Appeals never analyzed the cumulative impact of
18  all of the errors.  Ex. 4 at 51 ("Knox has not demonstrated that regardless of any errors,
19  he was denied a fair trial. Therefore, we hold that the cumulative error doctrine is
20  inapplicable.").   Because the Washington courts never adjudicated this federal
21  constitutional claim on its merits, review is *de novo*.  *Kipp v. Davis*, 971 F.3d 939, 949
22  (9th Cir. 2020), *petition for reh'g en banc denied* 986 F.3d 1281 (9th Cir. 2021).

23  The Ninth Circuit has held that the cumulative effect of multiple violations, even
24  from distinct constitutional claims, should be analyzed together.  For instance, in *Alcala*
25  *v. Woodford*, 334 F. 3d 862, 893-94 (9th Cir. 2003), the court found that the combined
26  effect of trial error (exclusion of evidence) and ineffective assistance of counsel (failure
27  to investigate) was sufficient to grant habeas relief.  The issue is whether the cumulative
28  effect of the errors "a substantial and injurious effect" and "operated to deprive Alcala of
a fundamentally fair trial." *Id*. at 893 (internal quotes omitted). "Even if no single error

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 40
*Knox v. White*, C21 - _____

Law Office of Neil Fox, PLLC
2125 Western Ave., Ste. 330
Seattle, Washington 98121
206-728-5440

were [sufficiently] prejudicial, where there are several substantial errors, 'their cumulative effect may nevertheless be so prejudicial as to require reversal.'" *Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002) (quoting *United States v. de Cruz*, 82 F.3d 856, 868 (9th Cir. 1996)). This doctrine fits in well with the obligation of a state court to assess *Brady* violations cumulatively. *Wearry v. Cain*, 136 S. Ct. at 1007 (state court "improperly evaluated the materiality of each piece of evidence in isolation rather than cumulatively.").

"In those cases where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative error." *Alcala*, 334 F.3d at 883. Here, the State's case was weak. There was no known reason why Mr. Knox would want the boyfriend of his friend and witness, Ms. Crimmins, to die, and there was no corroboration for Mr. Pippen's testimony about what he claimed occurred off the recording. The case was weak enough such that the jury found Mr. Knox "not guilty" of two of the three solicitation charges and the alleged unlawful imprisonment charge. Accordingly, analyzing all of the various errors cumulatively, it is apparent that Mr. Knox did not have a fair jury trial and that his rights to due process of law and effective assistance of counsel under the Sixth and Fourteenth Amendments were violated. This Court should grant relief.

### 4.   **Conclusion**

The Court should grant relief under § 2254, and order that the convictions be vacated and Mr. Knox released from custody.

DATED this 14th day of April 2021.

Respectfully submitted,


s/   Neil M. Fox
WSBA No. 15277
Attorney for Petitioner
Law Office of Neil Fox
2125 Western Ave. Suite 330
Seattle, WA, 98121

Phone: 206-728-5440
Fax:    866-422-0542
email:  nf@neilfoxlaw.com

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 41
*Knox v. White*, C21 - _____

Law Office of Neil Fox, PLLC
2125 Western Ave., Ste. 330
Seattle, Washington 98121
206-728-5440

*Verification of Counsel*

     I, Neil M. Fox, hereby verify that I am the attorney for Bradley David Knox.
I have filed the Petition Under 28 U.S.C. § 2254 For Writ of Habeas Corpus by a Person in State Custody in this case on behalf of Mr. Knox at his request.   Insofar as this memorandum of law expands in any way on the petition, I verify this petition and memorandum and know that the facts set forth in the petition and memorandum are true, either from my own personal knowledge or, upon information and belief, based upon all the facts brought out in the state court proceedings.

     I certify or declare under penalty of perjury that the foregoing is true and correct. This 14th day of April 2021, Seattle, WA

NEIL M. FOX
WSBA NO. 15277
Attorney for Petitioner

PETITIONER'S MEMORANDUM IN SUPPORT OF WRIT - Page 42
*Knox v. White*, C21 - _____

Law Office of Neil Fox, PLLC
2125 Western Ave., Ste. 330
Seattle, Washington 98121
206-728-5440