UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BRADLEY DAVID KNOX,

                                        Petitioner,

          v.

DANIEL W WHITE,

                                        Respondent.

CASE NO. 3:21-cv-05272-RSM-BAT

**REPORT AND
RECOMMENDATION**

    This consolidated federal habeas action consists of two 28 U.S.C. § 2254 petitions (Case No. 3:21-cv-05272 and Case No. 3:21-cv-05273) contesting two Washington State judgments (Cowlitz County Superior Court Nos. 14-1-00095-0 & 14-1-01283-4).

    For the reasons below, the Court recommends the habeas petition be **DENIED** and the matter be **DISMISSED with prejudice**. It is also recommended that issuance of a certificate of appealability be **DENIED**.

STATEMENT OF THE CASE

A.    Statement of Facts

    Petitioner is in custody under two state court judgments imposed for his convictions of solicitation to commit murder, unlawful possession of a controlled substance with intent to deliver, unlawful possession of a firearm, and bail jumping. Dkt. 10-1, Ex. 1 (Judgment and Sentence, Cowlitz County Cause No. 14-1-00095-0); Ex. 2 (Judgment and Sentence, Cowlitz

REPORT AND RECOMMENDATION - 1

County Cause No. 14-1-01283-4).[1] The Washington Court of Appeals summarized the facts underlying Petitioner's convictions as follows:

*Knox's VUCSA, Firearm, and Bail Jumping Case*

In January 2014, the LPD's Street Crimes Unit executed a search warrant at 909 California Way in Longview. On the property was a motor home, owned by Knox, and a storage building containing a loft area where Christian Sullivan resided. Officers observed Knox leaving the property in a vehicle, and they stopped the vehicle and detained him. Knox had $2,405 on his person. According to one officer, Knox stated that he lived in the motor home, said how much meth there would be inside and where to find it, and that he was a lower-end drug dealer.

In the motor home, police seized 27.4 grams of methamphetamine, two handguns, and drug paraphernalia, including cellphones, plastic bags, and a digital scale. In the storage building, police seized firearms.

While officers were searching the motor home and storage building, Sullivan arrived in a vehicle. Officers stopped the vehicle and detained Sullivan and his three passengers, including Robert Tubbs. Methamphetamine was discovered during a search incident to their arrest.

The State charged Knox with unlawful possession of a controlled substance (methamphetamine) with intent to deliver and two counts of first degree unlawful possession of a firearm. Knox later was charged with bail jumping when he failed to appear for court.

The State charged Sullivan with unlawful possession of methamphetamine, second degree unlawful possession of a firearm, and first degree possession of stolen property. He pleaded guilty to all three charges. The State charged Tubbs with attempted possession of methamphetamine and later bail jumping. He pleaded guilty to the attempted possession charge.

*Knox's False Imprisonment Case*

In August, Knox was driving with Hailey Crookshanks in his car when they got into an argument. Knox believed that Crookshanks was trying to steal his phone. According to Crookshanks, Knox started yelling at her and calling her

---

[1] Petitioner cites to the state court recording using bate-stamp numbering while Respondent cites to the state court record by exhibit and page number. Petitioner submitted the state court record at Dkts. 1-2 and 1-3; Dkts. 22-1 and 22-2 (Ex. 41); and Dkt. 23 (physical copy of CD). Respondent submitted the state court record at Dkts. 10 through 19. For ease of reference, the Court has used CM/ECF docket and page numbers.

profane names. Crookshanks started screaming for help, and a motorist stopped next to their vehicle and called the police. The State charged Knox with unlawful imprisonment.

*Knox's Solicitation Case*

Knox was detained in the Cowlitz County Jail. In September, a confidential informant also housed in the jail came forward with information concerning Knox. The informant stated that Knox had approached him and solicited him to kill Crookshanks, Crimmins, and Steven Walker, Crimmins's boyfriend. According to the informant, Knox initiated most of the conversations and the informant would just be listening. The informant understood Knox would pay him for the work in cash and discounts on drugs.

According to the informant, Knox was upset with Crimmins and Walker because he had given them money to take on the charges against him for possession of methamphetamine and guns at his house. Knox became angry with Crimmins and Walker because they had not yet come forward. Because Crimmins and Walker had used the money to buy a truck, Knox suggested that their truck be "[b]lown up or run off the road or something." Report of Proceedings (RP) at 606. With respect to Crookshanks, the informant stated that Knox "said the best thing to do with her because she's a heroin addict would be to give her a bad shot or shove her down the stairs where she lives at because nobody pay any difference." RP at 605.

The informant testified that he came forward with this information for two reasons. First, "Knox was asking everybody in ... jail to kill those guys for him," and "if [he] allowed that to continue without doing something about it" he would be "no better than [Knox] is." RP at 631-32. Second, the informant testified that he was hoping to get a benefit from this information as well.

After coming forward with the information regarding Knox, the informant agreed to wear a body wire to record his conversations with Knox. In October 2014, the informant recorded a conversation with Knox in the jail through the body wire. The State played portions of the audio recording at trial. On the wire, Knox can be heard asking the informant to kill Walker. There was no discussion on the wire of killing Crimmins or Crookshanks.

The State charged Knox with three counts of solicitation to commit first degree murder relating to Crimmins, Walker, and Crookshanks.

At trial, defense counsel cross-examined the informant about his previous contracts with the LPD's Street Crimes Unit and underlying motivations for coming forward. The informant acknowledged that he previously had worked as a confidential informant but was back in jail on drug charges. He testified that he had four outstanding criminal charges for two counts of possession with intent to

REPORT AND RECOMMENDATION - 3

deliver in a school bus zone, possession of methamphetamine, and tampering with evidence. By informing on Knox, the informant expressly stated he was hoping to get a benefit.

*Knox's Defense Counsel*

Before trial, Knox was represented by three different defense counsel. In January 2014, Cowlitz Office of Public Defense (OPD) attorney Josh Baldwin was appointed to represent Knox. In February, Baldwin had to withdraw from representing Knox. Baldwin cited conflict with Thad Scudder – a fellow OPD attorney representing Sullivan, a codefendant in Knox's VUCSA case – as the reason for his withdrawal.

Kevin Blondin then was appointed to represent Knox. In October 2014, Blondin withdrew from representing Knox at a trial readiness hearing, citing an inability to adequately communicate with Knox.

Baldwin once again was appointed to represent Knox. In a declaration, Baldwin explained that the OPD maintained a process for checking for conflicts at that time. According to Baldwin, when the public defender's office was appointed to represent someone, the clerk would send a list of cases to Terry Mulligan, OPD's director. Ex. 32 at 756. Mulligan then would check for conflicts. When Baldwin received Knox's VUCSA case back from Blondin, he assumed that Mulligan had done a new conflicts check. Mulligan may have thought that Sullivan's case had resolved and there [sic] no longer was a conflict.

In March 2015, Scudder appeared on behalf of Baldwin for Knox to request that a hearing be set over. In or around April, the State moved to join Knox's VUCSA case with his two other cases involving unlawful imprisonment and solicitation to commit first degree murder. Baldwin represented Knox in filing a motion opposing the joinder of all three cases.

In May, Baldwin left the OPD. At that time, OPD attorney Simmie Baer was appointed to represent Knox in all three cases. Baer represented Knox up until his appeal. In her declaration, Baer stated that she assumed that when she took over Knox's cases that any issues about conflicts of interest had already been resolved.

*Cowlitz County Prosecutors: Jurvakainen and Ladouceur*

Ryan Jurvakainen was an OPD attorney. Previously, Jurvakainen had been appointed to represent Tubbs in the case arising from the search warrant executed at Knox's residence. Jurvakainen later withdrew from representing Tubbs because OPD was then representing the listed co-defendant.

REPORT AND RECOMMENDATION - 4

In November 2014, Jurvakainen was elected Prosecutor of Cowlitz County. Thomas Ladouceur, another OPD attorney, became Jurvakainen's chief criminal deputy. Previously, Ladouceur had represented the informant in two separate matters: a probation violation in 2012; and drug charges and evidence tampering in 2014. In September 2014, Ladouceur had moved to withdraw from the second matter.

Jurvakainen disqualified himself from Knox's solicitation and unlawful imprisonment cases and Ladouceur disqualified himself from all three cases. Screening mechanisms were in place to prevent them from having any involvement in these cases.

In their capacity as OPD attorneys, neither Jurvakainen nor Ladouceur ever represented Knox.

*Withheld Evidence Concerning the Informant and Crimmins*

Before trial, Knox's defense counsel, Baer, requested that the State produce all material related to the informant and his criminal history. The prosecutor sent Baer an email listing only the informant's convictions. He also provided the informant's informant packet, including various police reports related to the informant's theft case and drug cases.

The State failed to disclose several police reports documenting the informant's history of alleged sexual misconduct, including that a minor had accused him of sexually abusing her and an adult had accused him of raping her. There also had been allegations that the informant molested his grandchildren. And in one of the reports, the informant allegedly admitted to continuing to buy and sell drugs after his release from jail in 2014.

In addition, the State failed to disclose two police reports that appeared to document a connection between Crimmins and Knox's residence at 909 California Way.

*Trial*

Knox's VUCSA, false imprisonment, and solicitation charges were consolidated and went to trial in October 2015. Judge Michael Evans presided over the trial.

The informant testified as described above. He also stated that Knox told him that he paid Crimmins money on the condition that she and Walker would accept responsibility for his drug and firearm charges, and that Walker had bought a truck with the money.

On cross-examination of Knox, the prosecutor inquired about Crimmins and Walker.

Q.    And you and your attorney in getting ready for [the drug and firearm] trial had previously indicated that Cassandra Crimmons [sic] was going to be your witness in the case, that she was going to testify that the guns belonged to her, right?

A.    Was there something I could see to see where I said that?

Q.    I'm just asking if you remember that or not?

A.    I remember talking to my attorney about my case. I don't remember making any other statements.

Q.    Okay. Well, not specifically asking what you told your attorney, that's privileged communication between the two of you. I'm just asking if you remember your attorney announcing that Cassandra is going to be your witness for the drug and gun case? ....

A.    Cassandra – if it's the same gun – bought a gun from T.J. Fox two days or three days before. Now, I don't know if that's the same gun. She said it was.

Q.    So she could have been a witness in your gun case because that could have been her gun?

A.    She could have been.

Q.    Okay. And you had actually paid her $8,000 to testify for you that it was her gun?

A.    No. No.

Q.    You're denying that?

A.    I am denying that.

Q.    Okay.

A.    I'm denying that I did that.

Q.    And they didn't show up to testify. They actually took that $8,000 and bought a truck; didn't they?

1           A.     I don't understand that because when I met Walker, he
2  already had a truck, so I don't know where you guys are coming up
    with this stuff.

3  RP at 838-40.

4           The State never presented evidence that the payment to Crimmins was in
the amount of $8,000, that Knox's attorney announced that Crimmins would be
5  called as a witness, or that Crimmins failed to appear to testify.

6           In the jury instruction regarding solicitation to commit first degree murder,
the trial court did not include a requirement that the solicitation constitute a true
7  threat. And Knox did not request such an instruction.

8           During closing argument, defense counsel addressed the solicitation
charge by trying to undermine the informant's credibility and arguing that Knox
9  suffered from diminished capacity. She also addressed the VUCSA and firearm
charges by arguing that Knox did not live at the motor home located at 909
10 California Way. Instead, she claimed that Knox was letting Sullivan stay there
and that the guns, the drugs, and the paraphernalia seized in the motor home
11 belonged to Sullivan.

12 *Verdict and Motion for New Trial*

13          The jury found Knox guilty of unlawful possession of a controlled
substance (methamphetamine) with intent to deliver, two counts of first degree
14 unlawful possession of a firearm, and bail jumping. The jury found Knox guilty of
the solicitation to commit first degree murder regarding Walker, but found him
15 not guilty of the charges regarding Crimmins and Crookshanks. The jury found
Knox not guilty of the wrongful imprisonment charge.

16
17          On the last day of trial, defense counsel had received a signed declaration
from Crimmins in which she took responsibility for the drugs and guns found at
Knox's residence at 909 California Way. Knox did not file a motion for a
18 continuance at that time. Instead, following the verdict, Knox moved for a new
trial based on newly discovered evidence. Defense counsel later met with
19 Crimmins in jail, who confirmed the contents of her statement.

20          The trial court denied the motion. The court found that defense counsel
was aware when she took over the file that Crimmins had made a statement in
21 which she claimed ownership of the drugs and firearms seized at Knox's motor
home. Therefore, the court concluded that the statement had not been discovered
22 since trial. As a collateral finding, the court found that Crimmins had told a
detective that Knox had paid her $20,000 to write the statement. In addition, the
23 court found that defense counsel had never listed Crimmins as a witness, sought a
continuance to locate her, hired a private investigator to locate her, or sought a

material witness warrant. The court concluded that Knox could not show that the evidence could not have been discovered before trial by the exercise of due diligence.

Dkt. 10-1, Ex. 3, (Opinion, Court of Appeals Cause No. 52971-8-II, at 2-10)

B.     State Court Procedural History

Respondent acknowledges that Petitioner properly exhausted his claims and that the habeas petition is timely. Dkt. 9, pp. 10-11. Therefore, the state court procedural history (set forth in Dkt. 9, pp. 7-9) is not repeated here.

ISSUES

Petitioner presents this Court with the following eight claims for relief:

Claim One

Mr. Knox's rights to due process of law under the Fourteenth Amendment to the United States Constitution and *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), were violated when the State did not disclose to the defense impeachment evidence related to Otis Pippen, the main witness in the solicitation count. The failure to disclose evidence also violated Mr. Knox's right to confront witnesses guaranteed by the Confrontation Clause of the Sixth Amendment (as applied to the states through the Due Process and Privilege and Immunities Clauses of the Fourteenth Amendment).

* * *

Claim Two

The Cowlitz County Prosecuting Attorney's Office should have been disqualified from this case, and the fact that it prosecuted Mr. Knox violated Knox's right to due process of law protected by the Fourteenth Amendment.

* * *

Claim Three

Mr. Knox was denied the right to counsel in violation of the Sixth Amendment to the United States Constitution (as applied to the states through the Due Process and Privilege and Immunities Clauses of the Fourteenth Amendment) based on multiple actual conflicts of interest.

* * *

Claim Four

Mr. Knox was denied the right to a neutral judge, in violation of due process, protected by the Fourteenth Amendment.

* * *

Claim Five

Mr. Knox's rights to freedom of speech protected by the First Amendment (as applied to the states through the Due Process and Privilege and Immunities Clauses of the Fourteenth Amendment) and due process of law protected by the Fourteenth Amendment were violated by failure of the jury instructions for solicitation to commit murder to include a "true threat" requirement.

* * *

Claim Six

Mr. Knox's right to confront witnesses protected by the Sixth Amendment (as applied to the states through the Due Process and Privilege and Immunities Clauses of the Fourteenth Amendment) and his right to due process of law under the Fourteenth Amendment were violated by the State's failure to tie up its impeachment of Knox's testimony.

* * *

Claim Seven

Mr. Knox was denied effective assistance of counsel at trial and on appeal in violation of the right to counsel provisions of the Sixth Amendment (as applied to the states through the Due Process and Privilege and Immunities Clauses of the Fourteenth Amendment) and due process provisions of the Fourteenth Amendment.

* * *

Claim Eight

Cumulative error denied a fair jury trial and due process of law in violation of the Sixth and Fourteenth Amendments.

Dkt. 1, at 19-24.

## EVIDENTIARY HEARING

An evidentiary hearing is precluded by *Cullen v. Pinholster*, 563 U.S. 170 (2011). As discussed below, the claims Petitioner properly presented to the state courts were adjudicated on

REPORT AND RECOMMENDATION - 9

1    the merits, and the state courts' rejection of the claims are neither contrary to or an unreasonable

2    application of clearly established Supreme Court law or based upon an unreasonable

3    determination of the facts given the record. Under these circumstances, this court is barred from

4    conducting an evidentiary hearing to further develop the facts on petitioner's claims. *Pinholster*

5    at 185 ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner

6    must overcome the limitations of § 2254(d)(1) on the record that was before the state court.");

7    *see also Sully v. Ayers*, 725 F.3d 1057, 1075 (9th Cir. 2013) ("Although the Supreme Court has

8    declined to decide whether a district court may ever choose to hold an evidentiary hearing before

9    it determines that § 2254(d) has been satisfied . . . an evidentiary hearing is pointless once the

10   district court has determined that § 2254(d) precludes habeas relief.") (internal quotation marks

11   and citation omitted). The *Pinholster* limitation applies equally to claims brought under §

12   2254(d)(2). *See Gulbrandson v. Ryan*, 738 F.3d 976, 993, n. 6 (9th Cir. 2013).

13           In sum, in determining whether relief is available under 28 U.S.C. § 2254(d)(1) or (2), the

14   Court's review is limited to the record before the state court. An evidentiary hearing is not

15   required if the allegations would not entitle petitioner to relief under 28 U.S.C. § 2254(d).  Here,

16   the Court concludes Petitioner is not entitled to relief and the habeas claims may be resolved by

17   review of the existing record without further discovery or supplementation of evidence presented

18   for the first time. Thus, no evidentiary hearing is required because Petitioner's allegations do not

19   entitle him to habeas relief.

20                                    STANDARD OF REVIEW

21           A federal court may not grant habeas relief unless the state court decision: "(1) was

22   contrary to clearly established federal law as determined by the Supreme Court, (2) involved an

23   unreasonable application of such law, or (3) . . . was based on an unreasonable determination of

1  the facts in light of the record before the state court." *See Fairbank v. Ayers*, 650 F.3d 1243,

2  1251 (9th Cir. 2011) (as amended); 28 U.S.C. § 2254(d)(1)–(2).

3        A state court's decision is contrary to clearly established federal law if it contradicts the

4  law set forth by the United States Supreme Court or reaches a result different than that reached

5  by the Supreme Court on materially indistinguishable facts. *See Terry Williams v. Taylor*, 529

6  U.S. 362, 405–06 (2000). A state court's decision is an unreasonable application of clearly

7  established federal law when the state court identifies the correct legal rule but applies it to a new

8  set of facts in a way that is objectively unreasonable. *See id*. at 407. "Clearly established federal

9  law means the governing legal principle or principles set forth by the Supreme Court at the time

10 the state court renders its decision." *Xiong v. Felker*, 681 F.3d 1067, 1073 (9th Cir. 2012)

11 (citation omitted). A court's determination of clearly established law rests on a Supreme Court

12 holding, not on circuit decisions. *See Wright v. VanPatten*, 552 U.S. 120, 125–26 (2008) (A

13 Supreme Court case must have "squarely address[ed]" a certain issue and given a "clear answer"

14 regarding the applicable legal rule to create "clearly established federal law.).

15       Turning to habeas relief based upon a claim that the state court unreasonably determined

16 the facts, "a federal court may not second-guess a state court's fact-finding process unless, after

17 review of the state-court record, it determines that the state court was not merely wrong, but

18 actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004); *see also Miller–El*

19 *I*, 537 U.S. 322, 340 (2010) ("[A] decision adjudicated on the merits in a state court and based on

20 a factual determination will not be overturned on factual grounds unless objectively unreasonable

21 in light of the evidence presented in the state-court proceeding, § 2254(d)(2).").

22       Additionally, state-court factual findings are presumed correct. This is a presumption the

23 petitioner must overcome by clear and convincing evidence. *Davis v. Ayala*, 135 S. Ct. 2187,

2199–2200 (2015) (quotation and citation omitted). Consequently, even if reasonable minds reviewing the record might disagree about a state court's factual determination, a federal habeas court cannot supersede the trial court's determination." *Id*. at 2201.

In considering a habeas petition, a federal court reviews the "last reasoned decision" from the state court. Where the final state court decision contains no reasoning, the court looks to the last decision from the state court that provides a reasoned explanation of the issue. *See Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). Where no state court decision articulates its underlying reasoning, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. . . ." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). When the state courts fail to provide reasoning for its decisions, a federal court must independently review the record and ascertain whether the state court's decision was objectively unreasonable." *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (citation and internal quotation marks omitted)." "Crucially, this is not a de novo review of the constitutional question. Rather, even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (citations and internal quotation marks omitted).

<u>DISCUSSION</u>

A.    <u>Claim One – *Brady* Violation</u>

Petitioner asserts violation of his Fourteenth Amendment due process rights, Sixth Amendment confrontational rights, and his right to exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed. 2d 215 (1963), were violated when the State did not disclose to the defense impeachment evidence related to Otis Pippen, the main witness in the solicitation count.

"There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one...." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *Pennsylvania v. Ritchie*, 480 U.S. 39, 59-60 (1987); *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995). The Constitution requires "disclosure only of evidence that is both favorable to the accused and 'material either to guilt or to punishment.'" *United States v. Bagley*, 473 U.S. 667, 674 (1985) (citing *Brady*, 373 U.S. at 87. Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. A "reasonable probability" is one "sufficient to undermine confidence in the outcome." *Id*. Impeachment evidence falls within the *Brady* definition of evidence favorable to the defense, but the petitioner must prove the undisclosed evidence was material to the outcome of trial to demonstrate a violation. *Id*. at 676-77.

To succeed on a *Brady* claim, a petitioner must show: (1) the evidence in question was favorable to the defendant, meaning that it had either exculpatory or impeachment value, (2) the prosecution possessed and withheld the evidence, and (3) the defendant was prejudiced by the suppression. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The prejudice prong requires that the petitioner establish a reasonable probability that the undisclosed evidence would have produced a different result. In determining whether the petitioner has satisfied this burden, the court must consider the evidence in light of all the evidence presented at trial, including forensic and other physical evidence and the testimony of other witnesses. *Id*. at 292-94. Information that is not admissible is not evidence, and thus cannot be material exculpatory evidence that would affect a verdict. *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995).

The Washington Court of Appeals first discussed the well-established federal law and principles governing Petitioner's *Brady* claim and the undisclosed evidence:

REPORT AND RECOMMENDATION - 13

Under *Brady* and its progeny, the State is required to turn over all potentially exculpatory evidence or evidence that could be used as impeachment evidence. *State v. Mullen*, 171 Wn.2d 881, 894, 259 P.3d 158 (2011). The due process clause in the Washington Constitution, article I, section 3, extends the same protection. *State v. Armstrong*, 188 Wn.2d 333, 344, 394 P.3d 373 (2017).

The State has a duty to learn of any favorable evidence "known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). But there is no *Brady* violation if the defendant, using reasonable diligence, could have obtained the evidence. *State v. Thomas*, 150 Wn.2d 821, 851, 83 P.3d 970 (2004).

The defendant bears the burden of proving three elements of a successful *Brady* claim: (1) the evidence at issue must be favorable to the defendant, either as exculpatory or impeachment evidence; (2) the State must have withheld the evidence; and (3) the evidence must be material to the defense. *State v. Davila*, 184 Wn.2d 55, 69, 357 P.3d 636 (2015).

Evidence is "material" if there is a reasonable probability that, if it had been disclosed to the defense, the result of the proceeding would have been different. *Id.* at 73, 357 P.3d 636. A defendant need not demonstrate that he would be acquitted if suppressed evidence had been disclosed. *Id.* Under the reasonable probability standard, the defendant must show only that the State's suppression undermines confidence in the trial's outcome. *Id.* We evaluate the effect of the State's failure to disclose favorable evidence cumulatively and in the context of the entire record. *Id.* at 78, 357 P.3d 636.

Our review of *Brady* claims involves a mixed question of fact and law. *Id.* at 74, 357 P.3d 636. The first two *Brady* factors are factual questions. *In re Pers. Restraint of Stenson*, 174 Wn.2d 474, 488, 276 P.3d 286 (2012). The third *Brady* factor is a question of law and fact. *Id.* But we review de novo the ultimate constitutional question of whether the State's failure to disclose certain information resulted in a due process violation. *Davila*, 184 Wn.2d at 75, 357 P.3d 636.

* * *

Knox asserts that the State violated *Brady* by failing to disclose (1) police reports of the informant's alleged history of sexual misconduct, (2) the informant's alleged admission that he continued to buy and sell drugs after release from jail in October 2014, and (3) the informant's favorable treatment from Cowlitz County Prosecuting Attorney's Office. Knox argues that this evidence would have provided an opportunity to impeach the informant by exposing his motivation to testify favorably for the State.

REPORT AND RECOMMENDATION - 14

a.    The Informant's Alleged Sexual Misconduct

First, police reports from January 2014 included an allegation from an adult female, MS, that the informant raped her. The allegation was made after an altercation between the informant and MS in which he pushed her out of his bedroom and closed the door and she kicked a hole in the door. MS was charged with malicious mischief. There is no indication in the reports that the informant was charged.

Second, police reports showed that in January 2015, the mother of JE, a seven-year-old-girl, reported to police that JE told her that the informant had rubbed her vaginal area. An investigation ensued, which included a forensic interview of JE and an interview of the informant. He denied the allegation. Investigators also performed a computer voice stress test on the informant and no deception was observed. The investigation report noted past allegations against the informant, including involving his grandchildren, which he denied. The lead investigator concluded that he could not establish probable cause that the informant had touched JE in the vaginal area for sexual gratification. The investigator stated that there was reason to be concerned about the informant because of the past allegations, but that charges could not be supported at that time.

Third, police reports show several allegations of sexual misconduct involving children. In September 1994, a girl alleged that the informant had touched her inappropriately and had forced her to masturbate him. She later recanted and refused to cooperate. In June 1996, two girls alleged that the informant had inappropriate sexual contact with them, including rape. He denied the allegations and blamed their mother for telling them to make the allegations. There is no indication in the record that the informant was charged on this allegation.

In September 2002, a five-year-old girl alleged that the informant had inappropriate sexual contact with her. An investigation ensued, including interviews with the girl and the informant. He denied the allegation and passed a computer voice stress test.

The State concedes that it improperly failed to include these reports in its response to Knox's request for the informant's criminal history.

b.    The Informant's Alleged Admission Regarding Drugs

Knox asserts that the prosecutor committed misconduct by failing to disclose the informant's admission that he continued to buy and sell drugs after his release from jail in 2014. That admission appears in a police report disclosed for the first time after trial. In an interview with a detective in January 2015, the informant allegedly stated that he had stopped using and selling drugs only in the

past month or so. Knox argues that the informant's admission would have been used to expose the informant's bias and destroy his credibility.

The State concedes that it improperly failed to include this report in its response to Knox's request for the informant's criminal history.

c.    The Informant's Favorable Treatment

Knox argues that the prosecutor committed misconduct by failing to disclose the State's alleged favorable treatment of the informant and the informant's apparent immunity from prosecution after his release from jail in October 2014. Knox contends that he would have used this information in an effort to undermine the informant's credibility and demonstrate the informant's incentive to misrepresent the facts for selfish gain. The State concedes that it improperly failed to include certain police reports containing this information.

Dkt. 10-1, Ex. 3 at 38-42.

The Washington Court of Appeals then determined that Petitioner had established the first and second elements of *Brady*, but denied the claim because Petitioner had not shown a reasonable probability that the outcome of the trial would have been different had the prosecution disclosed the withheld evidence:

d.    *Brady* Elements

The State essentially concedes that Knox has established the second *Brady* element: the State failed to disclose requested information. However, the State argues that Knox cannot establish the first and third elements: that the undisclosed information was favorable to him as impeachment evidence and that the information was material.

i.    Favorable as Impeachment

The first *Brady* element requires the undisclosed information to be favorable to the defendant, either as exculpatory or impeachment evidence. *Davila*, 184 Wn.2d at 69, 357 P.3d 636. The State claims that the undisclosed information does not satisfy the first *Brady* element because it would have been inadmissible under ER 608(b). [court's footnote 2. The admissibility of the undisclosed evidence also is an important aspect of materiality, the third *Brady* element. *Mullen*, 171 Wn.2d at 897, 259 P.3d 158. If the evidence is not admissible, it is unlikely that its nondisclosure could affect the outcome of the proceeding. *Id*.] We disagree.

REPORT AND RECOMMENDATION - 16

1      Under ER 608(b), a party may inquire into specific instances of a
witness's prior conduct, for purposes of impeachment only if the conduct is
2   probative of the witness's truthfulness or untruthfulness. ER 608(b). And ER
608(b) expressly does not permit introduction of extrinsic evidence to prove
3   specific instances of conduct.

4      ER 608(b) seems designed for prior conduct that is used to show only that
the witness is untruthful and nothing else. See 5A Karl B. Tegland, Washington
5   Practice: Evidence Law and Practice § 608.2, at 428 (6th ed. 2016). Tegland
states, "Rule 608 has been given a narrow reading even within the context of
6   impeachment. The rule has been interpreted to apply only when evidence of
reputation or specific conduct is offered on the issue of the witness's general
7   *truthful* or *untruthful* character." *Id.* (emphasis added). In that situation, the
evidence must be probative of truthfulness to be relevant.

8

9      But here, Knox argues that the prior conduct evidence could be used to
show not that the informant was untruthful, but that he had a *motive* to lie – so
10   that he would continue to avoid prosecution for the sexual misconduct allegations
and his drug sales. Knox asserts that the informant's seeming immunity from
11   prosecution would have been valuable impeachment evidence. Because the
purpose of this impeachment evidence was to show motive and address
12   substantive testimony, ER 608(b) is inapplicable. See Tegland, § 608.2 at 428-29.

13      We conclude that ER 608(b) would not have precluded Knox from
introducing evidence concerning the 2014 and 2015 allegations of sexual
14   misconduct against the informant and his continued drug use and sales to show at
least his motive to tailor his testimony to favor the State. Therefore, we conclude
15   that the evidence was favorable to Knox as impeachment.

16                    ii.     Materiality – Probability of Different Result

17      Even if the undisclosed information was favorable impeachment evidence
and admissible under ER 608(b), Knox still must establish that the additional
18   evidence regarding the informant would have created a reasonable probability of a
different result at Knox's trial. *Davila*, 184 Wn.2d at 73, 357 P.3d 636. Knox has
19   failed to do so.

20      On direct examination, the informant admitted that he came forward with
information about Knox's desire to have people killed because he was hoping to
21   get a benefit. On cross-examination, the informant admitted that he was facing
charges for two counts of possession with intent to deliver in a school bus zone,
22   possession of methamphetamine, and witness tampering that could put him in
prison for 10 years. He did not deny that he set people up in exchange for deals
23   with police so he did not have to go to prison. And he acknowledged that he was
concerned about going to prison because he had been labeled a snitch, which
could be dangerous to him.

REPORT AND RECOMMENDATION - 17

The informant admitted that he had entered into contracts with the State in 2013 to work off a felony theft charge and in 2014 to work off charges for two sales of methamphetamine. One of the conditions of the contracts was that he not commit any new crimes or use illegal drugs. However, he violated these conditions and he was arrested in August 2014 for possession of methamphetamine and for tampering with evidence. So he ended up back in jail not only on new charges but on all earlier charges as well. The informant stated when he agreed to wear a body wire, he was told that if he was successful in getting the officers what they needed, all those charges would go away. The informant knew that if he got Knox to talk on the wire about killing people, he would not go to prison.

We must determine whether in light of this evidence that the jury did hear, evidence regarding the 2014 and 2015 sexual misconduct allegations and the informant's admission that he had taken and sold drugs after he left jail would have created a reasonable probability of a different result at Knox's trial. Significantly, the jury heard compelling evidence regarding the informant's strong motive to help the State. Multiple charges that could result in 10 years in prison would be dismissed. Prison was a dangerous place for someone like the informant who had turned in others. The potential that the informant might be charged with additional crimes would not add much.

Further, the rape allegation was complicated by the fact that it arose out of a domestic dispute where the alleged victim was charged with malicious mischief. It is unlikely that this allegation would have changed the result at trial.

On the other hand, the child molestation allegation was different in kind than his other charges. Child molestation is a much more serious offense with a potentially longer prison term if the informant was charged and convicted. The potential that the State might decide to charge the informant based on this allegation would have given him even more motivation to tailor his testimony to favor the State.

One significant factor here is that the jury acquitted Knox on two of the three solicitation charges. He was convicted only of the charge that was supported by the wire recording. In other words, the jury convicted on the charge supported by objective evidence but acquitted on the charges based solely on the informant's testimony. This result suggests that the jury did not find the informant particularly credible, possibly because of his motives. It also suggests that additional evidence about the informant's motives would not have made a difference.

We conclude that the information about the 2014 and 2015 sexual misconduct allegations against the informant and his admission that he used and sold drugs after leaving jail would not have created a reasonable probability of a different result at Knox's trial.

REPORT AND RECOMMENDATION - 18

Regarding the sexual misconduct allegations against the informant in 1994, 1996 and 2002, these allegations were not material because they likely would have been inadmissible. Even if they were admissible, it is unlikely that these old and uncharged allegations would have affected the result at trial.

Finally, Knox argues that the informant's alleged sexual misconduct would have given him the opportunity to impeach the informant as to why he could not see his grandchildren. The informant testified that he did not get to see his grandchildren while he struggled with addiction. Knox contends that the more likely reason that the informant could not see his grandchildren was because he molested them. But it is unlikely that the trial court would have allowed this impeachment on a collateral matter.

Because Knox cannot satisfy the third element of a *Brady* violation, we hold that there was no Brady violation despite the State's failure to disclose information about the informant.

Dkt. 10, Ex. 42-46.

The Washington Supreme Court adopted the reasoning of the lower court:

As to the claimed disclosure violations, the Court of Appeals determined that the State improperly withheld information on the informant that would have been favorable as impeachment evidence, but it concluded that the information was not "material." Mr. Knox urges the court did not employ the correct standard. But it did. It set forth the standard as follows:

Evidence is "material" if there is a reasonable probability that, if it had been disclosed to the defense, the result of the proceeding would have been different. [*State v. Davila*, 184 Wn.2d 55, 73, 357 P.3d 636 (2015).] … . A defendant need not demonstrate that he would be acquitted if suppressed evidence had been disclosed. *Id*. Under the reasonable probability standard, the defendant must show only that the State's suppression undermines confidence in the trial's outcome. *Id*. We evaluate the effect of the State's failure to disclose favorable evidence cumulatively and in the context of the entire record. *Id*. at 78.

Slip op. at 12. This is a correct statement of the law. Mr. Knox takes issue with the court's failure to expressly articulate other formulations of the standard, such as the notion that materiality may be shown if there is a reasonable probability a single juror would have had reasonable doubt had the suppressed evidence been presented. *See In re Pers. Restraint of Stenson*, 174 Wn.2d 474, 493, 276 P.3d 286 (2012). But the notion that one juror may have prevented unanimity is necessarily subsumed within the analysis of whether there is a reasonable

probability the result would have been different. There is nothing in the Court of
Appeals analysis that suggests it did not have this notion in mind. The court
applied the correct law. Its thorough application of the law to the particular facts
of this case does not merit this court's review.

Dkt. 11-1, Ex. 17, pp. 289-290.

The Washington state courts concluded that the undisclosed information was favorable

impeachment evidence and admissible under ER 608(b), therefore, Petitioner satisfied the first

two *Brady* prongs. At issue is whether Petitioner was prejudiced, *i.e.*, whether the additional

evidence regarding the informant would have created a reasonable probability of a different

result at his trial.

Petitioner argues that the Washington Court of Appeals failed to utilize the proper federal

tests in analyzing his *Brady* claim. First, he contends that the Washington Court of Appeals

never applied the "one juror test" for determining the materiality of suppressed evidence.

Second, he contends that the Washington Court of Appeals explicitly used the term "unlikely"

when the federal standard is "clearly not more likely than not." Dkt. 22, pp. 6-7.

1.    One Juror Test

The Supreme Court has applied the "one juror" rule in capital cases. *See*, *e.g.*, *Wiggins v.*

*Smith*, 539 U.S. 510, 537 (2003) (determining "there is a reasonable probability that at least one

juror would have struck a different balance" in deciding whether to sentence Wiggins to death);

*Buck v. Davis*, 137 S. Ct. 759, 776 (2017) (finding "at least one juror would have harbored a

reasonable doubt about whether Buck was likely to be violent in the future."). Because Petitioner

does not cite a Supreme Court holding that applies the "one juror" rule to the guilt phase of a

non-capital trial, he does not show this argument rests upon clearly established federal law.

Petitioner notes however, that several district courts and the Ninth Circuit have applied the "one

juror" rule in non-capital murder cases. *See*, *e.g.*, *Weeden v. Johnson*, 854 F.3d 1063, 1071 (9th

REPORT AND RECOMMENDATION - 20

Cir. 2017) ("And, because the jury was required to reach a unanimous verdict on each count, the outcome could have differed if only "one juror would have struck a different balance.") (citing *Wiggins*, 539 U.S. at 537, 123 S.Ct. 2527).

Even assuming the "one juror" rule is clearly established in non-capital cases, the Washington Supreme Court clearly stated that the state courts were applying the "one juror" rule in adjudicating Petitioner's *Brady* claim. Dkt. 11-1, Ex. 17, at 2-3 ("But the notion that one juror may have prevented unanimity is necessarily subsumed within the analysis of whether there is a reasonable probability the result would have been different.").

Petitioner has failed to show that the state courts applied the improper standard.

2.    <u>Reasonable Probability Standard</u>

The "reasonable probability" standard for determining whether evidence is material under *Brady* is the same "reasonable probability" standard used for determining prejudice in claims of ineffective assistance of counsel. *See Strickler v. Greene*, 527 U.S. at 299 (noting that the Court in *United States v. Bagley*, 473 U.S. 667 (1985) took the phrase "reasonable probability" from *Strickland v. Washington*, 466 U.S. 668 (1984) as the appropriate standard to judge the materiality of information withheld by the prosecution); *Kyles v. Whitley*, 514 U.S. at 433 (same). The question under the "reasonable probability" standard is "whether it is 'reasonably likely' the result would have been different," and while this does not require the petitioner to prove "more likely than not" that the jury would have reached a different verdict, "the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" *Harrington*, 562 U.S. at 112. To satisfy the "reasonable probability" standard for prejudice, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id.*

1      Petitioner contends that the state courts' adjudication of this issue is not entitled to

2  AEDPA deference because the Washington Court of Appeals explicitly used the term "unlikely"

3  when analyzing the materiality of the *Brady* violation, when the federal standard is clearly not

4  "more likely than not." Dkt. 22, p. 7 (citing *Wearry v. Cain*, 577 U.S. 385, 136 S. Ct. 1002, 1006

5  194 L. Ed. 2d 78 (2016) (per curiam)). In *Wearry*, the Court found the state court adjudication

6  unreasonable because the state court incorrectly viewed each item of evidence in isolation rather

7  than cumulatively in the context of the entire record, and in evaluating the materiality of the

8  undisclosed evidence the state court failed to recognize that the prosecution's evidence

9  resembled "a house of cards" built solely on the credibility of one witness. *Wearry*, 577 U.S. at

10  392-94.

11      In contrast, the Washington Court of Appeals reviewed all the undisclosed evidence

12  against the entire trial record in determining there was no reasonable probability that the

13  evidence would have affected the outcome. Dkt. 10-1, Ex. 3, at 42-46; Dkt. 11-1, Ex. 17, at 289-

14  230. For example, the Court of Appeals found significant that the jury acquitted Petitioner on

15  two of the three solicitation charges and convicted him only of the charge supported by the wire

16  recording . . . "In other words, the jury convicted on the charge supported by objective evidence

17  but acquitted on the charges based solely on the informant's testimony. This result suggests that

18  the jury did not find the informant particularly credible, possibly because of his motives. It also

19  suggests that additional evidence about the informant's motives would not have made a

20  difference." Dkt. 10-1, Ex. 3 at 45.

21      Petitioner argues the state court applied an incorrect materiality standard because the

22  Washington Court of Appeals used the terms "likely" and "unlikely" when discussing whether

23  he had shown prejudice. Dkt. 22, p. 7 n.8 (referring to the Washington Court of Appeal's

1    decision at Dkt. 10-1, Ex. 3 (*i.e.*, "[i]t is unlikely that this allegation would have changed the

2    result at trial…."). A reviewing court, however, must focus on the entirety of the state court

3    opinions to determine whether the state courts applied the proper standard. *See Woodford v.*

4    *Visciotti*, 537 U.S. 19, 24 (2002) (reversing the Ninth Circuit holding that the state court used an

5    incorrect prejudice standard when it used the term "probable" and concluding the Ninth Circuit

6    had failed to give the proper benefit of the doubt to the state court decision). The Supreme Court

7    similarly held that the state court's use of the word "probably" did not show the state court had

8    applied an incorrect prejudice standard in reviewing a claim of ineffective assistance of counsel.

9    *Holland v. Jackson*, 542 U.S. 649, 654, 124 S.Ct. 2736, 159 L.Ed.2d 683 (2004). In *Holland*, the

10   Sixth Circuit concluded that the state court had incorrectly applied a preponderance standard,

11   based on three subsequent passages from its opinion. In reversing, the Supreme Court reiterated

12   that 28 U.S.C. § 2254(d) "requires that 'state-court decisions be given the benefit of the doubt'

13   (*id.,* 542 U.S. at 654 (quoting *Visciotti*, 537 U.S. at 24)) and that a "'readiness to attribute error is

14   inconsistent with the presumption that state courts know and follow the law.'" *Id.*

15      The Washington Supreme Court expressly acknowledged that Petitioner "need not

16   demonstrate that he would be acquitted if suppressed evidence had been disclosed" but that,

17   under the reasonable probability standard, must show only that "the State's suppression

18   undermines confidence in the trial's outcome." The Court also noted that it evaluates "the effect

19   of the State's failure to disclose favorable evidence cumulatively and in the context of the entire

20   record." Dkt. 11-1, Ex. 17, at 289 (quoting Dkt. 10-1, Ex. 3, at 39) (internal citations omitted).

21      The undersigned agrees that the state court's use of terms such as "likely" or "unlikely"

22   in this instance constitute "permissible shorthand" of the proper standard because it is clear from

23   the opinions as a whole that the state courts applied the proper standard. *See Holland*, 542 U.S. at

655 (use of term "probably" was permissible shorthand for "reasonable probability"); *Visciotti*, 537 U.S. at 22-24 (same).

The Court concludes that Petitioner cannot obtain relief under 28 U.S.C. § 2254(d) because he does not show the state court adjudication of his *Brady* claim was an unreasonable application of clearly established federal law or based upon an unreasonable determination of the facts.

B.    Claims Two, Three, and Four – Conflicts of Interest

In Claim 2 alleges the Cowlitz County Prosecuting Attorney's Office had a conflict of interest requiring disqualification of the entire office because the elected prosecuting attorney and chief criminal deputy formerly represented two witnesses who later testified in Petitioner's trial. In Claim 3, Petitioner alleges that his defense counsel had a conflict of interest because different attorneys from the same public defender's office represented the victims. And, in Claim 4, Petitioner alleges the judge had a conflict of interest because he formerly represented one of the witnesses.

Because none of these claims rests upon a holding of the Supreme Court, Respondent argues that the state court adjudication cannot be contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court and Petitioner cannot obtain relief under 28 U.S.C. § 2254(d). Dkt. 9, p. 26.

28 U.S.C. § 2254(d) allows relief only if the claim rests upon a holding of the Supreme Court because the phrase "clearly established federal law" limits the applicable law "to the holdings, as opposed to the dicta" of the Supreme Court's decisions. *Williams*, 529 U.S. at 412. However, the Supreme Court has recognized that the "the lack of a Supreme Court decision on

1    nearly identical facts does not by itself mean that there is no clearly established federal law, since

2    'a general standard' from this Court's cases can supply such law." *Marshall v. Rodgers*, 569 U.S.

3    58, 62 (2013).

4            Petitioner acknowledges that these claims do not rest upon a holding of the Supreme

5    Court, but argues that general principles of due process, conflict of interest, and appearance of

6    fairness guaranteed under the Due Process and assistance of counsel clauses in the Sixth and

7    Fourteenth Amendment are applicable. Dkt. 22, pp. 12-13.

8            1.    <u>Disqualification of Prosecuting Attorney's Office – Claim 2</u>

9            In Claim 2, Petitioner alleges the Cowlitz County Prosecuting Attorney's Office had a

10   conflict of interest requiring disqualification of the entire office because the elected prosecuting

11   attorney and chief criminal deputy formerly represented two witnesses who later testified in

12   Petitioner's trial.

13           Petitioner seeks to impose, through the Due Process Clause, an "appearance of

14   fairness" rule on state prosecutors, requiring disqualification of the entire prosecuting attorney's

15   office due to the elected prosecutor's and chief deputy's former representation of the witnesses.

16           Petitioner relies on *Young v. United States ex rel. Vuitton Et Fills S.A., et al.*, 481 U.S.

17   787 (1987) in support. Dkt. 1-1, p. 28. However, in *Young*, the Supreme Court specifically stated

18   that its decision was not based upon the Constitution and not as a matter of federal law. *See*

19   *Young*, 481 U.S. at 790 ("We now reverse, exercising our supervisory power...."); at 802 ("we

20   hold, in the exercise of our supervisory power...."); at 809 ("We rely today on that [supervisory]

21   authority...."); at 809 n. 21 ("we rely on our supervisory authority to avoid the necessity of

22   reaching any constitutional issues."); and at 826 (Powell, J., concurring in part) ("Here, the error

23   is not of constitutional dimension."); cf. at 814-15 (Blackmun, J., concurring). *See also*, *East v.*

1    *Scott*, 55 F.3d 996, 1000 n. 2 (5th Cir. 1995) ("*Young* was decided under the Court's supervisory

2    power over federal courts, not as a matter of federal constitutional law.")

3            The Supreme Court's supervisory power does not apply to the proceedings in the state

4    courts. *Smith v. Phillips*, 455 U.S. 209, 221 (1982).  Thus, while the Supreme Court has imposed

5    an "appearance of fairness" standard on federal prosecutors using the Court's supervisory power,

6    the Court has not imposed such a requirement on the States as a matter of federal constitutional

7    law. Moreover, a prosecutor need not be entirely "neutral and detached." *Marshall v. Jerrico,*

8    *Inc.*, 446 U.S. 238, 248 (1980); *see also,* Dkt. 9, p. 29 (lower court cases cited by Respondent

9    holding that the mere fact that a prosecutor may be familiar with parties of a case does not

10   necessarily disqualify the prosecutor from the case).

11           Petitioner also cites to *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980). Dkt. 1-1, at 29

12   n.27. However, that case involved an employer's challenge to the civil penalty provisions of the

13   Fair Labor Standards Act, where the court likened the functions of the assistant regional

14   administrator to a prosecutor, and noted that prosecutors need not be entirely "neutral and

15   detached," and "are necessarily permitted to be zealous in their enforcement of the law." *Id*. at 248.

16           Petitioner also relies on *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982)

17   for the general principle that the Due Process Clause guarantees defendants the right to

18   fundamental fairness. Dkt. 1-1, p. 29. However, such a highly generalized principle of law

19   derived from the Court's opinions does not constitute the clearly established federal law required

20   to grant relief under 28 U.S.C. § 2254(d). *See Lopez v. Smith*, 574 U.S. 1, 6 (2014) ("We have

21   before cautioned the lower courts . . . against 'framing our precedents at such a high level of

22   generality.'" (quoting *Nevada v. Jackson*, 569 U.S. 505, 512 (2013) (per curiam)). Petitioner

23   cites no holding of the Supreme Court that required disqualification of the entire prosecuting

attorney's office simply because the elected prosecutor and chief deputy formerly represented witnesses in the case.

Additionally, Petitioner has failed to show that the decision of the Washington Court of Appeals denying the claim that the elected prosecutor's and chief criminal deputy's representation of former clients required disqualification of the entire prosecutor's office, was an unreasonable application of clearly established federal law:

> The general rule is that when the elected prosecutor previously has represented the defendant "in the same case or closely interwoven matter," disqualification of the entire prosecutor's office is presumptively proper. *State v. Nickels*, 195 Wn.2d 132, 138, 456 P.3d 795 (2020). When a deputy prosecuting attorney is disqualified from a case and is effectively screened, disqualification of the entire office is not necessary. *State v. Stenger*, 111 Wn.2d 516, 522, 760 P.2d 357 (1988).

> For an elected prosecutor's conflicts other than prior representation of the defendant, the general rule is as follows:

>> Where the previous case is not the same case (or one closely interwoven therewith) that is being prosecuted, and where, for some other ethical reason the prosecuting attorney may be totally disqualified from the case, if that prosecuting attorney separates himself or herself from all connection with the case and delegates full authority and control over the case to a deputy prosecuting attorney, we perceive no persuasive reason why such a complete delegation of authority and control and screening should not be honored if scrupulously maintained.

> *Id*. at 522.

> Here, neither Jurvakainen nor Ladouceur represented Knox in this case or any other case before joining the prosecutor's office. Further, in a declaration Jurvakainen acknowledged that both had been disqualified from Knox's solicitation and wrongful imprisonment cases and Ladouceur acknowledged that he had been disqualified from all three of Knox's cases. And both described the screening mechanisms used to prevent anyone in the prosecutor's office from involving them in these cases. Therefore, under *Nickels* and *Stenger*, there is no basis for disqualifying the entire office.

> Knox points out that Jurvakainen never stated that he was disqualified from Knox's VUCSA case and that Jurvakainen's name continued to appear on

1        pleadings in the solicitation case even though he claimed he was disqualified.
2        Knox also emphasizes that Ladouceur was involved with the charging decision on
       one of the informant's sexual misconduct allegations even though he was a key
3        witness in Knox's trial. However, even if some conflicts remained that violated
       Knox's constitutional rights, he still must show actual and substantial prejudice in
4        order to prevail on his PRP. *Dove*, 196 Wn. App. at 154. Knox has not attempted
       to identity any actual prejudice that resulted from these alleged conflicts.

5                Therefore, we reject Knox's prosecutorial conflict of interest claim.

6 Dkt. 10, Ex. 3, 50-51.

7            2.   <u>Disqualification of Defense Counsel – Claim 3</u>

8        In Claim 3, Petitioner alleges that his defense counsel suffered from a conflict of

9 interest because attorneys from the same public defender's office represented the victims in his

10 case. Petitioner argues that "[t]his present and past concurrent representation violated the Sixth

11 and Fourteenth Amendments." Dkt. 1-1, p. 29 (citing *Mickens v. Taylor*, 535 U.S. 162 (2002)).

12        The Supreme Court's holdings concerning a Sixth Amendment conflict of interest

13 have involved only a single attorney's concurrent representation of multiple defendants in the

14 same criminal matter. *See Cuyler v. Sullivan*, 446 U.S. 335, 348-50 (1980) (one attorney

15 representing three defendants); *Holloway v. Arkansas*, 435 U.S. 475, 478-80 (1978) (one

16 attorney representing multiple defendants). Whether the Sixth Amendment conflict of interest

17 rule should be extended to other types of alleged conflicts, including even just extending the

18 conflict rule to cover successive representation of multiple defendants, remains an open question.

19 *Mickens*, 535 U.S. at 176; *see also Earp v. Ornoski*, 431 F.3d 1158, 1183-84 (9th Cir. 2005)

20 (*Mickens* explicitly cabined the Court's conflict jurisprudence); *Foote v. Del Papa*, 492 F.3d

21 1026, 1029-30 (9th Cir. 2007) (claim of appellate conflict of interest was not based upon clearly

22 established federal law); *Lambert v. Blodgett*, 393 F.3d 943, 986-87 (9th Cir. 2004) (holding that

23 claim of an imputed conflict was not based upon clearly established federal law).

1      In sum, Petitioner's claim that his defense counsel had a conflict of interest because

2 other attorneys from the same public defender's office also represented the victims' case fails to

3 show a violation of clearly established federal law as determined by the Supreme Court.

4 Moreover, even if the claim rested upon clearly established federal law as determined by the

5 Supreme Court, to have a constitutional error, an actual conflict must adversely affect counsel's

6 representation for the defense. *Cuyler*, 446 U.S. at 348-50. "[T]he possibility of conflict is

7 insufficient to impugn a criminal conviction." *Id*. "[U]ntil a defendant shows that his counsel

8 actively represented conflicting interests, he has not established the constitutional predicate for

9 his claim of ineffective assistance." *Id*. at 350.

10      The Washington Court of Appeals properly evaluated whether Petitioner's counsel

11 suffered from a vicarious or imputed conflict of interest and whether Petitioner had shown that

12 the conflict adversely affected his lawyer's performance:

13      The Sixth Amendment to the United States Constitution affords a criminal
defendant the right to effective assistance of counsel, free from conflicts of

14 interest. *State v. Kitt*, 9 Wn. App. 2d 235, 243, 442 P.3d 1280 (2019). To establish
a Sixth Amendment violation based on a conflict of interest, the defendant must

15 show "both that his attorney had a conflict of interest and that the conflict
adversely affected counsel's performance." *State v. Reeder*, 181 Wn. App. 897,

16 909, 330 P.3d 786 (2014). If the defendant meets this two-part test, prejudice is
presumed. *Id*.

17

18      "An actual conflict of interest exists when a defense attorney owes duties
to a party whose interests are adverse to those of the defendant." *State v. White*,

19 80 Wn. App. 406, 411-12, 907 P.2d 310 (1995). The matters alleged to be in
conflict must be "substantially related." *State v. MacDonald*, 122 Wn. App. 804,

20 813, 95 P.3d 1248 (2004).

21      To show that the conflict adversely affected his lawyer's performance, the
defendant must show that the conflict either caused some deficiency in

22 representation that affected the defendant's interests, or likely affected specific
aspects of defense counsel's advocacy on the defendant's behalf. *State v. Regan*,

23 143 Wn. App. 419, 428, 177 P.3d 783 (2008). "[T]he possibility of a conflict [is]
not enough to warrant reversal of a conviction." *State v. Dhaliwal*, 150 Wn.2d
559, 573, 79 P.3d 432 (2003). The defendant must show an actual conflict of

interest and a "strong possibility" that the conflict affected defense counsel's performance. *Id*. at 574.

### 3.    Actual Conflict

Knox argues that there was an actual conflict of interest because both he and Sullivan were represented by OPD attorneys Baldwin and Scudder and he was later represented by another OPD attorney, Baer. We disagree.

First, Knox fails to show that he and Sullivan were represented by OPD at the same time. Baldwin only appeared once for Sullivan in requesting a set over in August 2014. At that time, he had withdrawn from Knox's case because of Scudder's representation of Sullivan. Baldwin was not reappointed to represent Knox until October 2014. And Scudder only appeared once for Knox in requesting a set over in March 2015. At that time, he had withdrawn from Sullivan's case in December 2014.

Second, Knox fails to show that appropriate screening mechanisms were not in place at OPD. He claims that there was no established conflict screening mechanism set up at OPD and therefore that Baer, Baldwin and Scudder had access to confidential information regarding both clients. But Baldwin's declaration attached to Knox's PRP shows that OPD maintained a process of checking for conflicts coordinated by OPD's director.

Third, Knox failed to show that Baer received any confidential information about Sullivan from Scudder or Baldwin, or that she has access to information that could create an active conflict of interest. Baer never represented Sullivan, and she was presumably screened from his case. Sullivan entered a guilty plea in April 2014, over a year before trial began in Knox's case, and Knox makes no showing that Sullivan's interests as a codefendant in the VUCSA case were adverse to his own.

Therefore, we conclude that Knox has failed to show an actual conflict of interest. [court's footnote. Even assuming Knox could demonstrate an actual conflict of interest, we also conclude that he cannot show that any conflict had an effect on defense counsel's performance.]

Dkt. 10-1, Ex. 3, pp. 48- 50.

### 3.    Judge's Former Representation of Witness – Claim 4

In Claim 4, Petitioner alleges the judge had a conflict of interest because he formerly represented one of the witnesses.

REPORT AND RECOMMENDATION - 30

"It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 876 (2009) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). However, "'most matters relating to judicial disqualification [do] not rise to a constitutional level.'" *Caperton*, 556 U.S. at 876 (quoting *FTC v. Cement Institute*, 333 U.S. 683, 702 (1948). Most concerns are properly dealt with by common law, statute, or professional standards of the bench and bar. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Due process therefore requires that the defendant receive a fair trial "before a judge with no actual bias against the defendant and no interest in the outcome of his particular case." *Id*. at 905.

Although the Supreme Court has articulated some general guidelines, the Court acknowledged that "what degree or kind of interest is sufficient to disqualify a judge from sitting 'cannot be defined with precision.'" *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822 (1986). The Supreme Court cases requiring recusal all "dealt with had extreme facts that created an unconstitutional probability of bias" that cannot be measured under a particular set of rules. *Caperton*, 566 U.S. at 887. Thus, the Supreme Court evaluates claims of judicial bias using an objective standard. *Caperton*, 566 U.S. at 887. The primary question is "not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Id*. at 881. The petitioner must "overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). The Court should grant relief only where the judge "rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995).

Petitioner complains that the judge previously represented a key witness in Petitioner's trial, but this claim of judicial bias fails to present the type of extreme case the Supreme Court has previously found rose to a level warranting recusal. For example, in *Caperton*, the state court justice at issue "had received campaign contributions in an extraordinary amount from, and through the efforts of, the board chairman and principal officer of the corporation found liable for the damages." *Caperton*, 566 U.S. at 872-73. Here, the only allegation is that the judge formerly represented a key witness at trial. There is no allegation that the judge had an existing, ongoing relationship with the witness, or that the judge had a personal interest in the outcome of Petitioner's case. Although Petitioner may speculate that the judge favored the witness and disfavored him, any such allegation is pure speculation. Petitioner presents no proof that the judge had an objective bias towards him.

The Washington Court of Appeals also rejected the claim that the trial judge's prior representation of a key witness violated the right to an impartial judge:

> Knox argues that his right to an impartial judge was violated because the trial judge previously represented the informant. Knox contends that the trial judge violated due process by failing to disclose this representation and to recuse himself at trial. We disagree.

> Initially, it is important to recognize that Knox expressly states that his claim involves a constitutional due process challenge, not an appearance of fairness challenge. Therefore, cases addressing disqualification of a judge under the appearance of fairness doctrine are inapplicable.

> 1.    Due Process Right to an Impartial Tribunal

> Due Process "establishes the minimal requirements for a fair hearing." *State v. Blizzard*, 195 Wn. App. 717, 725, 381 P.3d 1241 (2016). Due process requires that a defendant receive a fair trial before a fair judge. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 692, 101 P.3d 1 (2004). "Denial of the constitutional right to a fair tribunal is a structural error that requires reversal regardless of prejudice." *Blizzard*, 195 Wn. App. at 727.

Whether a trial court has violated due process typically focuses on judicial bias. *See Blizzard*, 195 Wn. App. at 727-28. The question is not whether a judge has an actual, subjective bias. *Id.* at 727. Instead, we apply an objective analysis. *Id.* We ask "'whether as an objective matter, the average judge in his position is likely to be neutral or whether there is an unconstitutional potential for bias.'" *Blizzard*, 195 Wn. App. at 727 (quoting *Williams v. Pennsylvania*, —— U.S. ——, 136 S. Ct. 1899, 1905, 195 L. Ed. 2d 132 (2016) (internal quotation marks omitted). "Recusal is required when, objectively speaking, 'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'" *Rippo v. Baker*, —— U.S. ——, 137 S. Ct. 905, 907, 197 L. Ed. 2d 167 (2017) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S .Ct. 1456, 43 L. Ed. 2d 712 (1975)).

In *Blizzard*, the court noted:

Through our country's significant history of litigation, only three circumstances have been found to create unconstitutional judicial bias: (1) when a judge has a financial interest in the outcome of a case, (2) when a judge previously participated in a case in an investigative or prosecutorial capacity, and (3) when an individual with a stake in a case had a significant and disproportionate role in placing a judge on the case through the campaign process.

*Blizzard*, 195 Wn. App. at 727-28 (citing *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 877-84, 129 S. Ct. 2252, 173 L.Ed. 2d 1208 (2009)). A fourth possibility is when the judge has received highly offensive personal criticism. *Blizzard*, 195 Wn. App. at 728.

2.    Analysis

The appendix to Knox's PRP shows that the trial judge, Judge Evans, formerly represented the informant in March 2006 when he plead guilty to domestic violence third degree assault. However, the record contains no information about the nature and extent of the representation or whether Judge Evans even remembered the informant. As a result, Knox has failed to show a potential for actual bias. In addition, this case does not fall into any of the categories of unconstitutional judicial bias recognized by the court in *Blizzard*. 195 Wn. App. at 227-28.

Knox also argues that the trial judge's role as a former lawyer for the informant must be viewed in conjunction with the role of the prosecutor's office. But this argument appears to present an appearance of fairness claim which Knox expressly disclaimed, not a constitutional claim. And, as discussed above, Knox's claims concerning the prosecuting attorneys and their office are without merit. Therefore, we conclude that the role of the prosecutor's office does not elevate these circumstances to a constitutional violation.

REPORT AND RECOMMENDATION - 33

We hold that the trial judge's prior representation of the informant did not violate Knox's constitutional right to a fair trial.

Dkt. 10-1, Ex. 3, pp. 51-53.

On review, the Supreme Court of Washington determined that the Washington Court of Appeals had correctly resolved all three claims and that Petitioner had failed to show an actual constitutional conflict requiring disqualification of counsel or the judge:

As indicated, Mr. Knox also claims conflicts with defense attorneys, conflicts that should have required disqualification of the entire Cowlitz County Prosecutor's Office, and a conflict that required recusal of the trial judge. Again, the Court of Appeals addressed these matters in detail. As to defense counsel, the court found no showing of actual conflicts of interest nor any showing that a conflict, if it existed, affected counsel's performance. With respect to the prosecutor's office, the court determined that Mr. Knox failed to show that the entire office needed to be disqualified. The elected prosecutor disqualified himself from Mr. Knox's solicitation and unlawful imprisonment cases, and his chief criminal deputy disqualified himself from all three cases against Mr. Knox. [footnote omitted] Further, screening mechanisms were in place. Neither of these attorneys had previously represented Mr. Knox, so the measures they took were adequate. *State v. Stenger*, 111 Wn.2d 516, 522, 760 P.2d 357 (1988). Moreover, the Court of Appeals noted, Mr. Knox failed to identify any actual prejudice as to this matter, and thus he failed to show he was entitled to collateral relief. *See In re Pers. Restraint of Yates*, 177 Wn.2d 1, 17, 296 P.2d 872 (2013). Mr. Knox urges "structural error" existed here and thus prejudice is presumed. But even as to claimed errors that would be presumed prejudicial on direct appeal, the petitioner in a collateral challenge still must demonstrate actual prejudice. *In re Pers. Restraint of St. Pierre*, 118 Wn.2d 321, 328-29, 823 P.2d 492 (1992). Mr. Knox contends that he did demonstrate prejudice, but he does not show that the Court of Appeals decision holding otherwise merits this court's review.

As for the judge, who as an attorney had once represented the informant, again, the Court of Appeals applied correct legal principles to Mr. Knox's constitutional claim and found no showing of actual bias or potential for bias or any other constitutional violation. As with other claims, the court's application of correct legal principles to the specific facts of this case does not necessitate review by this court.

Dkt. 11-1, Ex. 17, pp. 290-291.

1    Petitioner's conflicts claims do not rest upon a holding of the Supreme Court or clearly

2    established federal law. Even if the claims did rest upon clearly established federal law, the

3    Washington courts reasonably determined that the screens put in place sufficiently avoided any

4    actual conflict of interest requiring disqualification of the prosecutor or substitution of defense

5    counsel and that Petitioner failed to show the actual bias needed to require recusal of the trial

6    judge.

7    The Court concludes that Petitioner cannot obtain relief under 28 U.S.C. § 2254(d)

8    because he does not show the state court adjudication of his conflicts claims was an unreasonable

9    application of clearly established federal law or based upon an unreasonable determination of the

10   facts.

11   C.    Claim Five – Failure to Include "True Threat" Element in Jury Instruction

12   In this claim, Petitioner alleges the failure to include a "true threat" element in the jury

13   instructions for solicitation to commit murder violated his rights under the First and Fourteenth

14   Amendments. Petitioner argues that the First Amendment requires a "true threat," which is

15   not based on the intent of the person making the statement so much as it is based on the

16   reaction to it by others. However, the jury instructions given at his trial focused on *his* intent –

17   not on whether his statements would cause a reasonable person to conclude that he was making a

18   true threat of harm. *See, e.g.*, Dkt. 1-3, p. 83 (Instruction 26: "a person commits the crime of

19   criminal solicitation to commit murder in the first degree when, *with intent* to promote or

20   facilitate the commission of a crime of murder in the first degree, …"); p. 89 (Instruction 32:

21   "the defendant … offered to give money … *with the intent* to promote or facilitate the

22   commission of the crime of murder in the first degree . . .") (emphasis added).

23   The Washington Court of Appeals rejected this claim:

Knox argues that the trial court erred in failing to give a true threat instruction in conjunction with the solicitation change. He contends that RCW 9A.28.030(1) must be construed to limit its application to true threats in order to avoid facial invalidation of the statute on overbreadth grounds under the First Amendment to the United States Constitution and article I, section 5 of the Washington Constitution. The State argues that a true threat instruction was unnecessary because RCW 9A.28.030(1) requires the State to prove the defendant's intent to promote or facilitate a crime. We agree with the State.

1.     Legal Principles

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." *See State v. Homan*, 191 Wn. App. 759, 766, 364 P.3d 839 (2015). To avoid violating the First Amendment, a statute criminalizing threatening language must also be construed "as proscribing only unprotected true threats." *State v. Allen*, 176 Wn.2d 611, 626, 294 P.3d 679 (2013).

We employ an objective test (*i.e.*, reasonable person standard) for what constitutes a "true threat" under the First Amendment. *State v. Trey M.*, 186 Wn.2d 884, 892-93, 383 P.3d 474 (2016). A "true threat" is a statement made in a context or under circumstances where a reasonable person would foresee that the statement would be interpreted as a serious expression of intent to inflict bodily harm upon or take the life of another person. *Id*. at 894, 383 P.3d 474.

Several types of crimes involving speech require a "true threat" jury instruction. *State v. Clark*, 175 Wn. App. 109, 114, 302 P.3d 553 (2013). However, a "true threat" jury instruction is unnecessary where the applicable statute requires the defendant to have some mens rea as to the result of the statement. *State v. Schaler*, 169 Wn.2d 274, 286, 236 P.3d 858 (2010); *Clark*, 175 Wn. App. at 114-15, 302 P.3d 553. The mens rea requirement essentially requires the State to prove that the threat was serious. *See Clark*, 175 Wn. App. at 115, 302 P.3d 553.

2.     Analysis

RCW 9A.28.030(1) states that the defendant's solicitation be made with "intent to promote or facilitate the commission of a crime." The trial court's jury instructions also defined the offense to include an intent requirement:

> A person commits the crime of criminal solicitation to commit murder in the first degree when, *with intent to promote or facilitate the commission of a crime of murder in the first degree*, he offers to give or gives money or other thing of value to another to engage in specific conduct which would constitute such crime or would establish complicity of such other person in its commission or

REPORT AND RECOMMENDATION - 36

1

2

       attempted commission had such crime been attempted or
committed.

3

Ex. 1 at 69 (emphasis added). Because the State was required to prove Knox's
intent to promote or facilitate a crime, under Schaler no "true threat" instruction
was necessary.

4

5

       Knox contends that the subjective intent required by the solicitation statute
is distinguishable from and not an adequate substitute for the objective "true

6

threat" requirement. But in the context of criminalizing speech, the reasonable
speaker-based standard for determining a "true threat" requires that the defendant
act with simple negligence. *Schaler*, 169 Wn.2d at 287, 236 P.3d 858. Because

7

the criminal solicitation statute and the trial court's instructions here required that
the State prove Knox's "intent to promote or facilitate the commission of a

8

crime," the jury had to convict Knox based on something more than a true threat.
*Id*. Therefore, RCW 9A.28.030's requisite intent supplies the mens rea for the

9

result that Schaler requires. *Clark*, 175 Wn. App. at 115, 302 P.3d 553.
We hold that the trial court did not err in failing to give a "true threat" instruction

10

in conjunction with the solicitation charge.

11

Dkt. 11-1, Ex. 3, pp. 53-55.

12

       Denying review, the Washington Supreme Court agreed that an existing scienter element

13

avoided overbreadth concerns and eliminated the need for an additional "true threat" element:

14

       Finally, Mr. Knox argues that the trial court erred in not giving a "true

15

threat" instruction in relation to the solicitation charge. But he cites no authority
suggesting that "true threat" principles apply to the crime of solicitation. In light

16

of free speech principles, a threat in relation to a crime such as harassment must
be a "true" one; that is, a statement that a reasonable person would foresee would
be interpreted as a serious expression of intent to harm or kill another person.

17

*State v. Trey M*., 186 Wn.2d 884, 894, 383 P.3d 474 (2016). But for solicitation to
commit first degree murder, the crime (and the danger) is not the expression of a

18

threat but the offering of something of value to another to commit murder with
intent to promote or facilitate the commission of murder. RCW 9A.28.030(1)

19

(definition of solicitation). If the State proves the requisite intent, the act of
offering something of value to carry out that intent does not implicate free speech

20

concerns. And even if it does, the intent required by the statute supplies the
necessary mens rea to satisfy free speech concerns. *See State v. Clark*, 175 Wn.

21

App. 109, 114-15, 302 P.3d 553 (2013) (true threat instruction not required for
intimidation of a witness because the State must prove the threat was made in an

22

attempt to induce the witness to not provide information to police). Mr. Knox
notes that he presented a diminished capacity defense and reasons it was therefore

23

necessary to instruct on whether his solicitation was a "true" threat. But his
mental state went to whether he really intended to facilitate the commission of

REPORT AND RECOMMENDATION - 37

murder. The jury was satisfied that the State proved such intent as to one of the solicitation charges (it acquitted Mr. Knox of two other charges). It did not have to further find that the threat was "true." This issue may be one of first impression, as Mr. Knox claims, but the Court of Appeals resolution of it is clearly correct.

Dkt. 11-1, Ex. 17, pp. 291-292.

In sum, the Washington courts found that a "true threat" jury instruction is not necessary where the applicable statute requires the defendant to have some mens rea as to the result of the statement. Established federal law is not to the contrary.

To obtain relief based upon an alleged instructional error, the petitioner must establish "not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten*, 414 U.S. 141, 146 (1973); *see also Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009); *Boyde v. California*, 494 U.S. 370, 380 (1990). The Court must consider the challenged instruction within the context of the jury instructions as a whole in light of the entire trial record. *Cupp*, 414 U.S. at 147; *Middleton v. McNeil*, 541 U.S. 433, 437 (2004). A petitioner's burden in this regard is especially heavy where the alleged error is not an erroneous instruction, but the failure to give additional instruction. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). Id., 431 U.S. at 155 ("An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.").

Petitioner fails to meet this burden as there is no authority suggesting that "true threat" principles apply to the crime of solicitation.

The Supreme Court has held that the First Amendment allows a State to "punish those words 'which by their very utterance inflict injury or tend to incite an immediate breach of the peace.'" *Virginia v. Black*, 538 U.S. 343, 359 (2003) (quoting *Chaplinsky v. New Hampshire*,

1    315 U.S. 568, 572 (1942). For example, "fighting words" that are inherently likely to provoke a

2    violent reaction are not protected by the First Amendment. *Black*, 538 U.S. at 359 (citing *Cohen*

3    *v. California*, 403 U.S. 15, 20 (1971)). The Supreme Court has also recognized that "the First

4    Amendment also permits a State to ban a 'true threat.'" *Black*, 538 U.S. at 359 (citing *Watts v.*

5    *United States*, 394 U.S. 705, 708 (1969)). "[T]hreats of violence are outside the First

6    Amendment." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992).

7            However, these "true threat" cases encompass statements where the speaker merely

8    communicates "a serious expression of an intent to commit an act of unlawful violence to a

9    particular individual or group of individuals." *Black*, 538 U.S. at 359 (citing *Watts*, 394 U.S. at

10   708) ("'political hyperbole' is not a true threat"). In these "true threat" cases, "[t]he speaker need

11   not actually intend to carry out the threat." *Black*, 538 U.S. at 359-60. "Rather, a prohibition on

12   true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear

13   engenders,' in addition to protecting people 'from the possibility that the threatened violence will

14   occur.'" *Id*. at 360. These "true threat" cases do not clearly establish a constitutional requirement

15   that jury instructions must always contain a "true threat" element when the law otherwise

16   requires intent of unlawful action.

17           Petitioner relies heavily on *Watts*, but in that case, the jury convicted based on the

18   defendant's political statement (threatening the President during a public rally) – it did not

19   convict based on a separate intent to actually commit the unlawful act. *Watts*, 394 U.S. at 707.

20   Because the statute criminalized "pure speech", the Supreme Court found the conviction to be

21   unconstitutional. *Id*. at 708. On the other hand, and as noted by the Washington Supreme Court

22   in this case, "the crime (and the danger) is not the expression of a threat but the offering of

23   something of value to another to commit murder with intent to promote or facilitate the

1  commission of murder." Dkt. 11-1, Ex. 17, pp. 291-292 (citing RCW 9A.28.030(1) (definition

2  of solicitation)). Thus, "[i]f the State proves the requisite intent, the act of offering something of

3  value to carry out that intent does not implicate free speech concerns. And even if it does, the

4  intent required by the statute supplies the necessary mens rea to satisfy free speech concerns." *Id.*

5        The presence of a scienter requirement generally avoids any unconstitutional invalidity.

6  *See*, *e.g.*, *Hoffman Estates*, 455 U.S. at 499 (rejecting challenge to an ordinance that regulated

7  marketing of cannabis and other drugs); *Posters 'N' Things, Ltd.*, 511 U.S. at 526 (rejecting

8  challenge to convictions for interstate conveyance as part of a scheme to sell drug paraphernalia

9  because the statute contained a scienter element); *Hill v. Colorado*, 530 U.S. 703, 732 (2000)

10  (rejecting overbreadth challenge to a criminal statute prohibiting approaching a person without

11  consent at a healthcare facility because the crime contained a scienter element); *Osborne v. Ohio*,

12  495 U.S. 103, 115 (1990) (rejecting overbreadth challenge to conviction under child

13  pornography statute because the crime included a scienter element).

14        Mr. Knox argues "[w]hatever the intent of a mentally ill person may have been, Knox's

15  statements were nonsensical and not sufficient to warrant being convicted of a crime because no

16  reasonable person would take them seriously." Dkt. 22, p. 14. However, as explained by the

17  Washington Supreme Court "his mental state went to whether he really intended to facilitate the

18  commission of murder. The jury was satisfied that the State proved such intent as to one of the

19  solicitation charges (it acquitted Mr. Knox of two other charges). It did not have to further find

20  that the threat was "true." *Id.*, p. 292.

21        The Supreme Court has not held that a crime of solicitation to commit murder, which

22  already contains a criminal scienter element, also requires a separate "true threat" element.

23

REPORT AND RECOMMENDATION - 40

1    Petitioner has also not shown that the state court adjudication was an unreasonable application of

2    clearly established federal law and therefore, he is not entitled to habeas relief on this claim.

3    D.    Claim Six – Violation of Confrontational Right

4            Petitioner contends that his right to confront witnesses protected by the Sixth Amendment

5    and his right to due process of law under the Fourteenth Amendment were violated when the

6    prosecutor failed to "tie up" the impeachment of Petitioner. In cross-examination, the prosecutor

7    stated, without introducing any evidence, that Petitioner had in fact paid Ms. Crimmins $8,000,

8    that his attorney announced that Crimmins would be called as a witness, and that Crimmins

9    failed to appear to testify. Dkt. 1-1, p. 39.

10           The Confrontation Clause prohibits the admission of testimonial hearsay unless the

11   declarant is unavailable, and the defense had a prior opportunity to cross-examine the declarant.

12   *Crawford v. Washington*, 541 U.S. 36, 59 (2004). The admission of non-testimonial evidence

13   does not violate the Clause. *Davis v. Washington*, 547 U.S. 813, 821-22 (2006). This is because

14   the Confrontation Clause only "applies to 'witnesses' against the accused – in other words, those

15   who 'bear testimony.'" *Crawford*, 541 U.S. at 51. Only testimonial statements "cause the

16   declarant to be a 'witness' within the meaning of the Confrontation Clause." *Davis*, 547 U.S at

17   821. "It is the testimonial character of the statement that separates it from other hearsay that,

18   while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation

19   Clause." *Id*.

20           The Supreme Court has not clearly established that the failure to "tie up"

21   impeachment, as opposed to the actual admission of testimonial hearsay, violates the

22   Confrontation Clause. In other words, the Supreme Court has not held that merely asking

23   questions, which the defendant denies on cross-examination, violates the Confrontation Clause.

REPORT AND RECOMMENDATION - 41

1    The Supreme Court has only held that admission of testimonial statements, offered to prove the

2    truth of the matter asserted in the statement, constitutes a confrontation violation. *See*, *e.g.*,

3    *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 329-30 (2009) (Thomas, J., concurring) (Clause

4    is implicated only by introduction of statements).[2]

5        Petitioner cites to state court case law to support his claim. See Dkt. 1-1, p. 39 n.33.

6    Lower court case law is not clearly established federal law and cannot be used to "bridge the

7    gap" between the holdings of the Supreme Court and the rule advanced by Petitioner's claim.

8    *Frost*, 574 U.S. at 24. "Circuit precedent cannot 'refine or sharpen a general principle of

9    Supreme Court jurisprudence into a specific legal rule that this Court has not announced.'" *Lopez*

10    *v. Smith*, 574 U.S. 1, 7 (2014) (quoting *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013)). Because

11    the Supreme Court has not held that a failure to "tie up" impeachment violates the Confrontation

12    Clause, Petitioner's claim does not rest upon a holding of the Supreme Court, and the state court

13    adjudication of this claim cannot be an unreasonable application of clearly established federal

14    law.

15        Here, the Washington courts held that, because the prosecutor's cross-examination

16    suggested personal knowledge or the existence of additional extrinsic evidence demonstrating

17    these prejudicial facts, his questions were improper. They concluded, however, that any

18    misconduct did not cause actual and substantial prejudice to Petitioner's defense. The

19    Washington Court of Appeals held as follows:

20        "'A person being tried on a criminal charge can be convicted only by
       evidence, not by innuendo.'" *State v. Miles*, 139 Wn. App. 879, 886, 162 P.3d
21       1169 (2007) (quoting *State v. Yoakum*, 37 Wn.2d 137, 144, 222 P.2d 181 (1950)).
       A prosecutor who asks questions that imply the existence of a prejudicial fact

22

23    [2] Even when the prosecution admits an out-of-court statement, the statement does not violate the
    Confrontation Clause if it is not admitted to prove the truth of the declarant's assertions in the
    statement. *Tennessee v. Street*, 471 U.S. 409, 413-14 (1985).

1    must be prepared to prove that fact. *See State v. Babich*, 68 Wn. App. 438, 444,
2    842 P.2d 1053 (1993). A prosecutor's impeachment of a witness by referring to
     extrinsic evidence that is never introduced may violate a defendant's right to
3    confrontation. *Id*. at 445-46. A prosecutor may not use impeachment as a means
     of submitting evidence to the jury that is otherwise unavailable. *Id*. at 444.

4    2.    Analysis

5        Here, the prosecutor inquired if Knox "paid [Crimmins] $8,000 to testify
     for [him]"; if Crimmins and Walker "took that $8,000 and bought a truck"; if
6    Knox "and [his] attorney ... had previously indicated that Cassandra Crimmins
     was going to be [his] witness in the case, that she was going to testify that the
7    guns belonged to her"; and if Crimmins and Walker "didn't show up to testify."
     RP at 838-40. Knox either denied or responded equivocally to each inquiry.
8    Contrary to Knox's contentions, the State offered evidence to prove that Knox
     paid Crimmins, that Walker bought a truck with the money, and that Knox
9    intended to call Crimmins as a witness. On direct examination, the informant
     testified that Knox gave Crimmins and Walker money to take responsibility for
10   the charges against him. According to the informant, Knox said that Crimmins
     bought a truck with the money. And on cross examination, Knox confirmed that
11   Crimmins could have been a witness.

12       However, the State failed to offer evidence to prove that Knox paid
     Crimmins $8,000, that his attorney announced that Crimmins would be called as a
13   witness for the drug and gun case, or that Crimmins failed to appear to testify.
     Because the prosecutor's cross-examination suggested personal knowledge or the
14   existence of additional extrinsic evidence demonstrating these prejudicial facts,
     we conclude that his questions were improper.
15
16       But we also conclude that any misconduct did not cause actual and
     substantial prejudice. The questions that the prosecutor failed to tie up were a
17   relatively minor part of the prosecutor's cross examination. The informant
     confirmed that a payment was made, just not the amount. Whether Knox's
18   attorney announced that Crimmins would testify or whether Crimmins failed to
     appear are not particularly significant.

19       Knox does not identify how he was prejudiced by the improper questions.
     He argues that the error was not harmless under the constitutional harmless error
20   standard. But the PRP standard is actual and substantial prejudice. *Dove*, 196 Wn.
     App. at 154. Knox has shown none.
21
22       We hold that the State improperly failed to tie up two suggestive cross-
     examination questions, but Knox cannot establish actual and substantial prejudice.
23   Therefore, we reject Knox's argument.

REPORT AND RECOMMENDATION - 43

1    Dkt. 10-1, Ex. 3, pp. 56-57. Denying review, the Washington Supreme Court agreed with the

2    conclusion of the Washington Court of Appeals. Dkt. 11-1, Ex. 17, p. 291.

3          Like other trial errors, the violation of the Confrontation Clause is subject to harmless

4    error analysis. *Moses v. Payne*, 555 F.3d 742, 755 (9th Cir. 2009). A determination that an error

5    was harmless is an adjudication of the claim "on the merits" for purposes of 28 U.S.C. § 2254(d).

6    *Davis v. Ayala*, 576 U.S. 257, 268 (2015). Thus, "when a state court determines that a

7    constitutional violation is harmless, a federal court may not award habeas relief under § 2254

8    unless the harmlessness determination itself was unreasonable." *Fry v. Pliler*, 551 U.S. 112, 119

9    (2007) (emphasis in original) (citing *Mitchell v. Esparza*, 540 U.S. 12 (2003)). The Court may

10   not grant relief "if the state court simply erred in concluding that the State's error were harmless;

11   rather, habeas relief is appropriate only if the [state court] applied harmless-error review in an

12   'objectively unreasonable' manner." *Mitchell*, 540 U.S. at 18.

13         In addition, the Court may not grant relief unless the error resulted in actual prejudice.

14   *Brecht v. Abrahamson*, 507 U.S. 619, 637-39 (1993). The *Brecht* actual prejudice standard

15   applies regardless of whether the state court applied a proper analysis. *Davis*, 576 U.S. at 269-70.

16   The Court need not formally apply both the AEDPA and *Brecht* standards, and may deny relief if

17   either the state court decision was not unreasonable, or the error did not cause actual prejudice.

18   *Fry*, 551 U.S. at 120; *Davis*, 576 U.S. at 269-70. But a petitioner must satisfy both the

19   unreasonableness standard of 28 U.S.C. § 2254(d)(1), and the *Brecht* actual prejudice standard,

20   to obtain relief. *Fry*, 551 U.S. at 119-20; *Davis*, 576 U.S. at 268-70.

21         Petitioner fails to show actual and substantial prejudice. As correctly noted by the

22   Washington Court of Appeals, the questions that the prosecutor failed to tie up were a relatively

23   minor part of the cross examination, the informant confirmed that a payment was made, and

REPORT AND RECOMMENDATION - 44

1  whether Crimmins failed to appear after Petitioner's attorney stated that she would, is not

2  particularly significant.

3        Petitioner fails to establish that the state courts unreasonably applied clearly

4  established federal law when the state courts determined that the error did not cause actual

5  prejudice. Thus, Petitioner cannot obtain relief under 28 U.S.C. § 2254(d) on his Confrontation

6  Clause claim.

7  E.     Claim Seven – Ineffective Assistance of Counsel

8        Petitioner raised a claim of ineffective assistance counsel at trial and on direct appeal

9  under the Sixth and Fourteenth Amendments, *Strickland v. Washington*, 466 U.S. 668 (1984),

10  and *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). Petitioner argued that his trial counsel (Simmie

11  Baer) was not only conflicted, but also failed to uncover Pippen's background, did not move to

12  disqualify the prosecutor's office, did not find out the judge had been Pippen's lawyer and failed

13  to try to disqualify him, failed to subpoena Ms. Crimmins or investigate her connection to the

14  trailer, failed to object to the State's failure to tie up its impeachment, and failed to request a

15  "true threat" instruction. On appeal, Petitioner contends that his lawyer did not raise issues

16  related to the "true threat" instruction, the failure of the State to tie up the impeachment (with a

17  direct appeal standard of harmlessness) or the denial of the new trial motion. Dkt. 1-1, p. 40.

18        For his claims of ineffective assistance of counsel, Petitioner must show that his counsel's

19  performance was deficient and "fell below an objective standard of reasonableness." *Strickland*

20  *v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Petitioner must also

21  show that "there is a reasonable probability that, but for counsel's unprofessional errors, the

22  result of the proceeding would have been different." *Id*. at 694, 104 S.Ct. 2052. "A reasonable

23  probability is a probability sufficient to undermine confidence in the outcome." *Id*.; *see also id*.

1    at 697, 104 S.Ct. 2052 (noting that "a court need not determine whether counsel's performance

2    was deficient before examining the prejudice suffered by the defendant as a result of the alleged

3    deficiencies"). Proof that the result of the proceedings would have been different requires a

4    'substantial,' not just 'conceivable,' likelihood of a different result. *Pinholster*, 563 U.S. at 189.

5    In reviewing counsels' performance, we "indulge a strong presumption that counsel's conduct

6    falls within the wide range of reasonable professional assistance." *Id*. at 689, 104 S.Ct. 2052.

7            Like a claim of ineffective assistance of trial counsel, the Court reviews a claim of

8    ineffective assistance of appellate counsel under *Strickland's* two-prong standard. *Roe v. Flores-*

9    *Ortega*, 528 U.S. 470, 477 (2000); *Smith v. Murray*, 477 U.S. 527, 536 (1986); *Smith v. Robbins*,

10   528 U.S. 259 (2000). First, the petitioner must prove that appellate counsel's performance fell

11   below an objective standard of reasonableness. *Flores-Ortega*, 528 U.S. at 477. The Court's

12   review of counsel's representation must be highly deferential. *Id*. To provide effective

13   representation, counsel is not required to raise every non-frivolous or colorable issue on appeal.

14   *Jones v. Barnes*, 463 U.S. 745, 750-54 (1983). Appellate counsel must make strategic decisions

15   when selecting which claims to pursue on appeal, and the process of winnowing out claims and

16   focusing on the issues more likely to succeed on appeal is the hallmark of effective advocacy. *Id*.

17   at 751-52. "[A] lawyer who throws in every arguable point – 'just in case' – is likely to serve her

18   client less effectively than one who concentrates solely on the strong arguments." *Miller v.*

19   *Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989). Second, the petitioner must show that counsel's

20   deficient performance prejudiced the defense. *Flores-Ortega*, 528 U.S. at 477.

21           Although Petitioner raised only one claim of ineffective assistance of counsel, the claim

22   includes numerous allegations of ineffectiveness of trial and appellate counsel. See Dkt. 1-1, at

23

40. The Washington Court of Appeals addressed each allegation and applied the correct two-prong *Strickland* standard to Petitioner's claim of ineffective assistance of his trial counsel:

> Knox argues that he was actually and substantially prejudiced by ineffective assistance of counsel due to his trial counsel's failure to (1) request a "true threat" instruction for the solicitation charge, (2) move for the disqualification of the Cowlitz County Prosecutors Office and the trial judge, (3) adequately investigate the informant's background, (4) discover evidence regarding Crimmins' connection to Knox's residence, and (5) use due diligence in discovering evidence regarding Crimmins' statement before trial. We disagree.

> 1.    Legal Principles

> Ineffective assistance of counsel arises from the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To prevail on an ineffective assistance claim, the defendant must show both that (1) defense counsel's representation was deficient and (2) the deficient representation prejudiced the defendant. *Id*. at 457-58. Representation is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness. *Id*. at 458. Prejudice exists if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have differed. *Id*.

> We apply a strong presumption that defense counsel's performance was reasonable. *Id*. Counsel's conduct is not deficient if it was based on what can be characterized as legitimate trial strategy or tactics. *Id*. To rebut the strong presumption that counsel's performance was effective, "the defendant bears the burden of establishing the absence of any 'conceivable legitimate tactic explaining counsel's performance.'" *State v. Grier*, 171 Wn.2d 17, 42, 246 P.3d 1260 (2011) (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

> The "reasonable probability" standard for prejudice in an ineffective assistance of counsel claim on direct appeal is not precisely the same as the "actual and substantial prejudice" standard in a PRP. *See In re Pers. Restraint of Crace*, 174 Wn.2d 835, 842, 280 P.3d 1102 (2012). However, a petitioner who presents a successful ineffective assistance of counsel claim necessarily establishes actual and substantial prejudice for purposes of collateral relief. *Id*. at 846-47.

> 2.    Failure to Request a "True Threat" Instruction

> As discussed above, we hold that a "true threat" instruction is not required in conjunction with the solicitation charge. Therefore, we hold that Knox did not receive ineffective assistance of appellate counsel on this ground.

3.     Failure to Move for Disqualification of Prosecutors or Judge

Knox has not demonstrated, and in fact has not even argued, that the trial court would have granted motions to disqualify the entire prosecutor's office or the trial judge. In the absence of such evidence, Knox cannot show either that defense counsel's performance was deficient or that he was prejudiced. Therefore, we hold that Knox did not receive ineffective assistance of appellate counsel on this ground.

4.     Failure to Investigate

Failure to investigate evidence, at least when coupled with other defects, can amount to ineffective assistance of counsel. *State v. A.N.J.*, 168 Wn.2d 91, 110, 225 P.3d 956 (2010); *see also In re Pers. Restraint of Brett*, 142 Wn.2d 868, 882, 16 P.3d 601 (2001). An attorney breaches his duty to his client if he fails "'to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 721, 101 P.3d 1 (2004) (quoting *Strickland v. Washington*, 466 U.S. 668, 690-91, 104 S. Ct. 2052, 80 L.Ed. 2d 674 (1984)). "Defense counsel must, 'at a minimum, conduct a reasonable investigation enabling [counsel] to make informed decisions about how best to represent [the] client.'" *Davis*, 152 Wn.2d at 721 (alterations in original) (quoting *Brett*, 142 Wn.2d at 873). "This includes investigating all reasonable lines of defense, especially 'the defendant's most important defense.'" *Id*. (quoting *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001)).

a.     Failure to Investigate the Informant

In the discussion of *Brady* above, we concluded that the additional information about the informant that the State failed to disclose would not have affected the outcome of the trial. Under that same analysis, even assuming that defense counsel provided deficient performance in failing to discover that information, Knox cannot show prejudice under the ineffective assistance of counsel standard. Therefore, we hold that Knox did not receive ineffective assistance of appellate counsel on this ground.

b.     Failure to Investigate Crimmins Evidence

Knox argues that Baer was ineffective in failing to conduct an adequate investigation of evidence connecting Crimmins to his residence. According to Knox, a reasonable investigation would have uncovered exculpatory evidence that would have provided a defense to the charged VUCSA offense. We disagree.

A police report attached in the appendix to Knox's PRP confirms that police told Knox about evidence connecting Crimmins to his property. In a

declaration attached in the appendices of his PRP, Knox stated that he told Baer about this evidence:

> When I got out of jail in early 2014, I had contact with police officers regarding the burglaries and thefts from 909 California Way. I was told by an officer that the police had evidence Ms. Crimmins had stored her personal property there and had been intercepted trying to remove it. I recall telling Ms. Baer about this report and I wanted her to get the documentation. She asked me who the officer was and I said I did not know. That was the end of the matter.

Ex. 37 at 778.

In her declaration attached in the appendices of Knox's PRP, Baer addressed the evidence:

> Because Ms. Crimmins took responsibility for the drugs and guns found at the motor home at 909 California Way, I would have wanted to have other evidence to verify her connection to that address. The State did not disclose to me, as they should have, pursuant to Brady and Kyles, a police report (L14-543) which documented that Ms. Crimmins stored her personal property at 909 California Way in January 2014. Had I known of this report, I would have used this information to support Mr. Knox's defense at trial that the drugs and guns in the motor home were not his.

Ex. 30 at 749. Baer never stated that Knox told her about the evidence.

Assuming Knox told Baer about the evidence concerning Crimmins and Baer failed to perform a meaningful investigation, the question here is whether this failure caused prejudice. The evidence at issue was information that Crimmins had stored her personal property at Knox's residence. However, this evidence did not directly involve whether Crimmins owned the drugs and guns the officers found when they arrested Knox. At best, it allowed speculation that if Crimmins kept her personal belongings at Knox's motor home, the drugs and guns officers seized were part of those belongings. We conclude that Knox cannot show that the result of the trial would have been different if this evidence had been presented to the jury.

        c.      Failure to Locate Crimmins

Knox also argues that Baer was ineffective in failing to use due diligence to locate Crimmins so she could testify at trial. In her declaration, Baer states that she received a signed declaration from Crimmins on the last day of trial in which she took responsibility for the drugs and guns found at Knox's residence at 909

California Way. After trial, Baer located and visited Crimmins in jail, and Crimmins confirmed that the declaration was correct.

In denying Knox's motion for a new trial based on Crimmins' declaration, the trial court suggested that Baer through due diligence could have located Crimmins in time for her to testify. But Baer documented her many unsuccessful efforts to locate Crimmins. What she did not do was to hire a private investigator or request a material witness warrant.

However, what the record leaves unanswered is whether Baer had a strategic reason for not wanting Crimmins to testify. Although Baer knew that Crimmins had made a statement claiming ownership of the drugs and firearms seized at Knox's motor home, Baer did not put her on the pretrial witness list. And although Baer received a copy of the signed statement before the end of trial, she did not seek a continuance to locate Crimmins so she could testify. In her declaration, Baer did not address why she took those actions or whether or not she actually wanted Crimmins to testify. [court's footnote. It is possible that Baer was concerned about an officer's statement that Crimmins told him that Knox had paid her $20,000 to make the statement. If Crimmins testified, that evidence would be presented to the jury as impeachment.]

Baer's strategy at trial was to blame Sullivan for Knox's VUCSA charge. In closing argument, Baer argued that Knox did not live at the motor home. Instead, Knox was letting Sullivan stay there and the seized drugs, firearms, and scales belonged to Sullivan. It is possible that Baer made a strategic and informed decision against calling Crimmins as a witness to support an alternative theory. On this record, it is impossible for the court to tell whether Crimmins would have been called to testify even if Baer had located her. In the absence of evidence regarding defense counsel's strategic or tactical decision making, it is difficult for us to find ineffective assistance of counsel. *See State v. Linville*, 191 Wn.2d 513, 525, 423 P.3d 842 (2018).

We hold that on this record, Knox cannot meet his burden of establishing ineffective assistance of counsel based on Baer's failure to locate Crimmins.

See Dkt. 10-1, Ex. 3, pp. 60- 65.

The Washington Court of Appeals further addressed each allegation and applied the

correct two-prong *Strickland* standard to Petitioner's claim of ineffective assistance of his

appellate counsel:

REPORT AND RECOMMENDATION - 50

K.     Ineffective Assistance of Appellate Counsel

Knox argues that he received ineffective assistance of counsel due to his appellate counsel's failure to challenge (1) the trial court's failure to give a "true threat" instruction, (2) the trial court's denial of the motion for a new trial based on evidence about Crimmins discovered after trial, (3) the prosecutor's failure to tie up his impeachment questions to Knox, and (4) the sufficiency of the State's evidence supporting his VUCSA conviction.

As discussed above, we hold that claims (1) and (4) raised in his PRP have no merit. And (3) involved error but no prejudice. Therefore, we only address whether appellate counsel provided ineffective assistance in failing to challenge the trial court's denial of the motion for a new trial. To that end, the question here is whether the trial court erred in denying Knox's CrR 7.5(a)(3) motion for new trial based on newly discovered evidence. We conclude that it did not.

1.     Legal Principles – Motion for New Trial

CrR 7.5(a)(3) states that a trial court may grant a motion for a new trial based on newly discovered evidence that "the defendant could not have discovered with reasonable diligence and produced at trial." A new trial may be granted under this rule if the proponent can establish that the new evidence "(1) will probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching." *State v. Williams*, 96 Wn.2d 215, 223, 634 P.2d 868 (1981) (emphasis omitted). The absence of any one of these factors is grounds to deny a new trial. *Id.*; *State v. Larson*, 160 Wn. App. 577, 586, 249 P.3d 669 (2011).

We review for an abuse of discretion a trial court's denial of a motion for a new trial. *State v. Pete*, 152 Wn.2d 546, 552, 98 P.3d 803 (2004). A trial court abuses its discretion by reaching a conclusion no reasonable judge would reach. *Id.* We will reverse a trial court's denial of a new trial motion only where the moving party clearly shows that the trial court abused its discretion. *See id.*

2.     No Abuse of Discretion

For an ineffective assistance of appellate counsel claim, a defendant generally must establish that the appellate court would have reversed if counsel had raised the issue on appeal. *See In re Pers. Restraint of Meredith*, 191 Wn.2d 300, 308, 422 P.3d 458 (2018). The question here is whether this court on direct appeal would have reversed the trial court's denial of a new trial based on newly discovered evidence.

The trial court denied Knox's motion after concluding that both the second and third *Williams* factors were lacking. Regarding the second factor, the court

found that Baer knew when she received the file that Crimmins had made a statement claiming ownership of the drugs and firearms seized from Knox's motor home. Knox does not challenge this finding. And the finding supports the court's conclusion that the statement was not first discovered after trial.

Regarding the third factor, the trial court found that Baer had never listed Crimmins as a witness, sought a continuance to locate her, hired a private investigator to locate her, or sought a material witness warrant. Knox does not challenge this finding. And the finding supports the court's conclusion that Knox could not show that the evidence could not have been discovered before trial by the exercise of due diligence.

We conclude that the trial court did not err in denying Knox's motion for a new trial based on newly discovered evidence. Therefore, we hold that Knox cannot show ineffective assistance of appellate counsel.

Dkt. 10-1, Ex. 3, pp. 65-67.

The undersigned concludes that the Washington Court of Appeals neither unreasonably applied clearly established Supreme Court precedent nor unreasonably adjudicated the facts in light of the evidence presented, when it denied Petitioner's ineffective assistance claims. Petitioner has failed to show that his counsels' performance was deficient or that there was a substantial likelihood of a different result at trial or on appeal. Accordingly, Petitioner is not entitled to habeas relief on this claim.

F.    Claim Eight – Cumulative Error

Petitioner contends that the cumulative effect of all the errors alleged (*Brady,* conflicts of interest, non-neutral prosecutors and judge, no "true threat" instruction), violated the Sixth and Fourteenth Amendments. He also argues that this Court should review his claim *de novo* because the Supreme Court Commissioner never addressed the cumulative error and the Court of Appeals did not properly analyze the cumulative impact of all the errors. The undersigned disagrees.

The Washington Court of Appeals reasonably rejected the claim:

Knox argues that cumulative error denied him a fair trial. Under the cumulative error doctrine, the defendant must show that the combined effect of

multiple errors requires a new trial. *State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017).

Here, Knox has not demonstrated that regardless of any errors, he was denied a fair trial. Therefore, we hold that the cumulative error doctrine is inapplicable.

Dkt. 10-1, Ex. 3, p. 65.

Petitioner contends that the state court did not adjudicate the claim because it held that "the cumulative error doctrine is inapplicable." The Court disagrees. The state court was not avoiding the claim; rather, it was stating that because Petitioner had failed to demonstrate prejudice arising from any one of the multiple alleged errors, combining the multiple alleged errors could not establish an entitlement to relief.

While a claim of cumulative error is clearly established federal law, Petitioner is not entitled to relief because he failed to show constitutional error, let alone combined errors, that caused actual prejudice. Alleged errors that are individually insufficient to require habeas corpus relief do not become meritorious simply because the petitioner aggregates the alleged errors into one claim. *See Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987). When a petitioner fails to demonstrate prejudice arising from any single error, he is not entitled to relief under a cumulative error analysis.

<u>CONCLUSION</u>

Based on the foregoing, the undersigned recommends that Petitioner's habeas petition be denied, with prejudice.

<u>CERTIFICATE OF APPEALABILITY</u>

A prisoner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of the petition only after obtaining a certificate of appealability ("COA") from a district or circuit judge. A COA may be issued only where a petitioner has made "a substantial showing

of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(3).  A prisoner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

Under this standard, the Court finds that no reasonable jurist would disagree petitioner's claims are premature as he has not yet been convicted and has not yet exhausted his claims in the state courts.  Additionally, no reasonable jurist would disagree that a federal court should abstain from interfering with petitioner's pending criminal charges and dismiss the case as petitioner requests.  Petitioner should address whether a COA should issue in his written objections, if any, to this Report and Recommendation.

## OBJECTIONS AND APPEAL

This Report and Recommendation is not an appealable order.  Therefore, a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge enters a judgment in the case.

Objections, however, may be filed and served upon all parties no later than **August 23, 2021.**  The Clerk should note the matter for **August 25, 2021**, as ready for the District Judge's consideration if no objection is filed.  If objections are filed, any response is due within 14 days after being served with the objections.  A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served.  The matter will then be ready for the Court's consideration on the date the response is due.  Objections and responses shall not exceed twelve (12) pages.  The failure to timely object may affect the right to appeal.

REPORT AND RECOMMENDATION - 54

1    DATED this 5th day of August, 2021.

2

3                                          _____

4                                          BRIAN A. TSUCHIDA
                                           United States Magistrate Judge
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

REPORT AND RECOMMENDATION - 55